Cara MUNN, et al., Plaintiffs,

v.

The HOTCHKISS SCHOOL, Defendant.

No. 3:09–cv–919 (SRU).

United States District Court,
D. Connecticut.

Signed June 5, 2014.

Alinor Clemans Sterling, Bridgeport, CT, Antonio Ponvert, III, Michael P. Koskoff, William M. Bloss, Koskoff, Koskoff & Bieder, P.C., Bridgeport, CT, for Plaintiffs.

Aaron S. Bayer, Carolina D. Ventura, Jeffrey R. Babbin, Jessica Bruno Vetter, Penny Q. Seaman, Wiggin & Dana, New Haven, CT, Daniel J. Krisch, Karen L. Dowd, Kenneth James Bartschi, Halloran & Sage, LLP, Hartford, CT, Michael T. McGinley, Wiggin & Dana LLP, Stamford, CT, Wesley W. Horton, Horton, Shields & Knox, Hartford, CT, for Defendant.

## RULING ON DEFENDANT'S MOTION FOR A NEW TRIAL, RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, AND MOTION TO ALTER JUDGMENT

STEFAN R. UNDERHILL, District Judge.

In July 2007, Cara Munn contracted tick-borne encephalitis ("TBE") while on a trip to China sponsored by her boarding school, The Hotchkiss School ("Hotchkiss"). TBE attacks the central nervous system, causing swelling in the brain and spinal cord. In severe cases, the inflammation results in permanent brain damage. Munn suffered that fate: She has lost the ability to speak; she has little control over her facial muscles, so that she always appears to be smiling and often drools uncontrollably; and she has cognitive deficits that slow her ability to think through complex problems.

Munn and her parents, Orson and Christine Munn (collectively "the Munns"), filed this lawsuit alleging that Hotchkiss's negligent planning of the trip and careless supervision during the trip caused Cara to fall ill. On March 27, 2013, after seven days of evidence including testimony from the Munns, school personnel, and almost a dozen experts, the jury found Hotchkiss solely liable for Munn's injuries. It awarded the Munns $10.25 million in past

and future economic damages, and $31.5 million in non-economic damages.

Hotchkiss now challenges that verdict and award, moving for judgment as a matter of law under Rule 50(b) (doc. 206), or, in the alternative, for a new trial under Rule 59 of the Federal Rules of Civil Procedure (doc. 207). The school asserts five claims in support of its motions: (1) Munn's infection was unforeseeable; (2) Munn failed to prove that she was infected with TBE in a specific location; (3) the court mismanaged expert testimony; (4) Mr. and Mrs. Munns' negligence contributed to Munn's injury; and (5) a $41.75 million verdict is excessive. Hotchkiss additionally moves to alter judgment (doc. 209). For the reasons set forth, the combined motions are denied, and the motion to alter judgment is denied as moot in light of the parties' joint stipulation regarding collateral source reduction (doc. 251).

## I. Background

### A. *Facts*

Munn entered Hotchkiss as a fourteen-year-old freshman in the fall of 2006. Trial Tr. 988:12. During the winter of her first year, Munn learned of Hotchkiss's international programs, and, after discussion with her mother, she signed-up for Hotchkiss's summer school in Tianjin, China. Trial Tr. 912:9–18. The China program immersed students in Chinese language and culture; for one month, participants attended intensive language classes at a high school during the week and visited cultural landmarks on the weekends. Pls.' Trial Ex. 11.

During the spring semester, Jean Yu, the director of Hotchkiss's Chinese Language and Culture Program and the trip

leader, and David Thompson, the director of Hotchkiss's International Programs, provided students and parents with information about the trip. In early March 2007, Yu sent an email with two attachments: a packet that outlined the trip's activities and a set of legal forms that asked participants and parents to waive legal claims against the school. Def.'s Trial Exs. 507, 616. The packet mentioned that the students would visit "Mount Pan" [1] as part of a Tianjin city tour. Def.'s Trial Ex. 506, at 2; Def.'s Trial Ex. 507, at 4. Parents were instructed to sign and return the waiver. Def.'s Trial Ex. 616, at 1. Christine Munn, Munn's mother, and Munn both signed the waiver. Pls.' Mot. in Limine, Ex. C (doc. 143).

In April 2007, Yu followed up with another email with medical advice for trip participants. Pls.' Trial Ex. 2. It included a link to a U.S. Centers for Disease Control and Prevention ("CDC") webpage and instructed parents that the Hotchkiss infirmary could "serve as a travel clinic." *Id.* But the advice was inaccurate; the web address linked to a webpage on Central America, not China, and the school infirmary was only available to administer vaccines prescribed by an outside doctor and could not give students independent advice on medical risks abroad. Trial Tr. 79:4–19, 209:14–16, 220:4–7. According to Thompson, the school expected students to know about the school clinic's limitations and to "go to a travel medicine specialist or a travel clinic at home ... when the students would have two, two and-a-half weeks [of spring break]." Trial Tr. 237:1–9.

Yu also sent recipients a complete itinerary, a packing list, and a handbook on international travel. Pls.' Trial Ex. 2. The

---

**1.** Throughout the travel materials and testimony in the record, Mount Panshan is alternately referred to as "Mount Pan," "Mt. Pan," and "Panshan mountain."

itinerary again listed "Mount Pan" as part of a city tour. Pls.' Trial Ex. 10. The packing list mentioned bug spray under the category "Miscellaneous," just above the item "musical instrument." Pls.' Trial Ex. 2. The travel handbook contained no warnings about insect-borne disease, though it devoted pages to other health risks, including a reminder to be wary of foreign blood banks in the event a student required surgery abroad and advice to bring American condoms to China to avoid using faulty protection and contracting a serious sexually-transmitted disease. Pls.' Trial Ex. 1.

Thus, as Munn headed to China, neither she nor her parents had notice that she would visit a non-urban, forested area that might contain ticks or other insects carrying disease. Nor had Munn or her parents received any warnings about how to prevent insect-borne disease during the trip. The first few weeks of Munn's trip proceeded without incident: she attended classes, visited sites, and made new friends. Yu testified that the students were all healthy during that time and that she only heard complaints about bug bites once, when the children visited Nanking University at dusk. Trial Tr. 569:11–570:8.

On June 23, 2007, the students left for a weekend excursion about sixty miles from Tianjin's city center. The students visited the Great Wall in the early morning, and they arrived at Mount Panshan in the late morning or very early afternoon. Trial Tr. 594:11–22. According to video and pictures admitted at trial, Mount Panshan is a forested peak that sits next to several other smaller foothills. Pls.' Trial Exs. 20, 405; Def.'s Trial Ex. 614. It is surrounded by what Americans might call an exurban landscape—a traditionally rural community with growing housing density

created by commuters to the cities. Trial Tr. 512:12–18, 551:14–17.

No one had warned students that they should dress for a serious hike—all walked up the mountain in shorts and t-shirts or tank tops, and some even wore sandals instead of sneakers. Def.'s Trial Ex. 614. No one warned students to apply bug spray before they trekked up the mountain. Indeed, Yu left her bug spray on the bus. Trial Tr. 540:15–24. At the beginning of the hike, a guide led students up a paved pathway to a set of temples at the top of the mountain. Trial Tr. 592:6–10. At the top of the mountain the group split-up: Teachers, chaperones, and the majority of students rode a cable car down the mountain. Trial Tr. 519:1–522:25, 538:1–540:25. Munn and two or three other students, however, asked to walk down the mountain by themselves. Id. Yu pointed them towards the path and said she would wait for them at the bottom. Id.

According to Munn's uncontroverted testimony, the students decided to leave the paved path and venture down Mount Panshan on narrow dirt trails that connected other temples on the mountain. Trial Tr. 526:1–533:25, 1007:22–1008:15. Munn recounted that the hikers quickly became lost and ended up walking among trees and through brush before eventually finding the path and reconnecting with the others. Trial Tr. 1029:7–25. The students then visited another forested area of Mount Panshan, one reached by a dirt path. Pls.' Trial Ex. 20; Trial Tr. 1029:1–1030:25.

After the trip to Mount Panshan, Munn recalled having many insect bites and a welt on her arm. Trial Tr. 1008:14–22, 1034:17–1035:13. Other than itchy discomfort, though, she felt fine. Trial Tr. 1034:17–1035:7, 1036:8–10. Ten days later she awoke with flu-like symptoms—a headache, a fever, and wooziness. Pls.'

Trial Ex. 36–2; Trial Tr. 693:6–16. Munn then grew more disoriented, and Yu decided to take her to the local hospital.

From that point, Munn's condition deteriorated rapidly. Pls.' Trial Ex. 36–2, 36–3. The local hospital transferred her to a Beijing hospital, and her parents arrived from the United States. Trial Tr. 694:1–11, 915:19–916:16; Pls.' Trial Ex. 36–2, at 29; Pls.' Trial Ex. 36–3, at 4–5, 7. They found her severely ill. Trial Tr. 915:22–916:14; Pls.' Trial Ex. 36–3, at 23. She was partially paralyzed. Pls.' Trial Ex. 36–3, at 23, 25; Trial Tr. 694:5–6; 918:10–919:2. She could not speak. Pls.' Trial Ex. 36–3, at 23, 25; Trial Tr. 694:15–20. She dipped into a semi-comatose state. Pls.' Trial Ex. 36–3, at 25; Trial Tr. 918:15–25. Once it became clear that Munn's condition would not improve quickly, her father arranged for her to be airlifted to New York, where she was admitted to New York Presbyterian Hospital. Trial Tr. 919:3–8, 990:22–991:15; Pls.' Trial Ex. 36–5, at 1.

After a week at New York Presbyterian and a month at a rehabilitation center, Munn's condition stabilized and improved, but she was left permanently disabled. She never regained the ability to speak. Trial Tr. 800:7–11. Indeed, her vocal cords are so taut that she can at best make soft, single-syllable sounds, and like a "child who's developing language," she often cannot be understood by strangers. Trial Tr. 783:3–25, 794:11–796:4. Her hands have limited dexterity, particularly in her fingers, which are too stiff to bend easily, inhibiting the fine motor skills that facilitate tasks like typing. Trial Tr. 860:1–20, 928:17–929:13, 1013:3–10, 1071:20–1073:4, 1078:23–1079:4. She has limited control over her facial muscles, so that she drools, has difficulty eating and swallowing, and exhibits socially inappropriate expressions. Trial Tr. 792:3–794:10,

929:16–930:1, 991:18–993:10, 1010:3–14, 1012:11–1013:1.

Munn's brain function is also compromised. She suffers from diminished executive function, which, according to the neuropsychologist who testified on her behalf, makes constructing multi-step solutions to everyday problems difficult. Trial Tr. 848:22–850:7, 852:14–853:24, 854:13–855:22, 861:3–862:24, 877:12–879:7. For this reason, Munn's scores on problem-solving tests have plummeted. Thus, although her verbal comprehension (vocabulary) scores remain in the ninety-sixth percentile— comparable to her pre-injury scores—her reading comprehension and math scores have fallen precipitously; she now scores in the third percentile for reading comprehension, Trial Tr. 863:17–864:25, 869:15–19, and in the first percentile for math. Trial Tr. 869:19–22. Her scores on perceptional reasoning are almost as low, in the twelfth percentile. Trial Tr. 865:1–866:12. In other words, Munn is a "very intelligent person" but has great difficulty "using that intelligence, accessing it, planning [with] it." Trial Tr. 868:10–869:2.

That said, Munn is in other ways normal. She still experiences the world much the same way as a person without a brain injury might—she understands what happens around her, she reads, she writes, she feels, she has opinions, and she dreams about her future. Indeed, with help, she finished high school and enrolled at Trinity University in Hartford, Connecticut. Trial Tr. 924:14–17; 981:7–982:20.

B. *Procedural History*

On June 11, 2009, Orson and Christine Munn filed this lawsuit as next friend to their daughter, Cara, alleging that Hotchkiss's negligence in the execution of its 2007 China Summer Program caused Munn's injuries while Munn was a student in Hotchkiss's care. Specifically, the

Munns alleged that Hotchkiss was negligent in: (1) failing to properly warn Munn and her parents of the risks of insect-borne diseases, specifically, viral encephalitis; (2) failing to provide proper protective clothing, insect repellent, or vaccination by its employees and agents; (3) failing to provide appropriate medical personnel on the trip who could diagnose or arrange treatment for students on the trip; (4) failing to establish procedures for identifying medical emergencies, notifying parents of seriously ill children, and transporting seriously ill students to the United States for treatment; and (5) failing to advise the Munns of the availability of vaccines against viral encephalitis for children of Munn's age traveling to rural areas of northeastern China in summer 2007. Compl. ¶ 41 (doc. 1); Am. Compl. ¶ 41 (doc. 79) (amended at Munn's majority to include her claims as an independent party). At trial, the Munns abandoned the majority of these grounds for liability, proceeding with their arguments regarding Hotchkiss's alleged failure to adequately warn of the risks of insect-borne disease on the China trip, and the alleged failure by its employees and agents to provide proper protection or prophylaxis (e.g., clothing, insect repellent, vaccination).

In addition to denying the allegations of negligence, Hotchkiss asserted several affirmative defenses, including that the Munns' claims were barred by the doctrine of assumption of risk when the Munns signed the school's pre-trip "Agreement, Waiver, and Release of Liability"; Munn's injuries were the result of *force majeure* or caused by third parties; Munn's injuries were caused by her parents' contribu-

tory negligence; and finally, that with the exception of injuries caused solely by Hotchkiss's negligence or willful misconduct, the Munns' claims were barred by a signed release and waiver. Answer 3–4 (doc. 82).

After four years of discovery, two settlement conferences, a dispositive motion hearing and numerous pre-trial motions, the parties undertook a ten-day jury trial in which nine fact witnesses and ten expert witnesses testified. After the Munns rested their case, Hotchkiss moved for a directed verdict (judgment as a matter of law) pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, arguing that Munn contributed to her own injuries and that the risk of contracting insect-borne diseases while in Tianjin Province[2] was unforeseeable as a matter of law. Trial Tr. 1200:17–1201:17. I denied that motion, noting that the key bases for the motion focused on factual disputes that were within the province of the jury as the trier of fact, rather than questions of law. Trial Tr. 1201:18–1202:2.

At the culmination of the trial, the jury found that the Munns met their evidentiary burden in showing (1) Hotchkiss was negligent in failing to warn Munn of the risk of insect-borne illnesses; (2) Hotchkiss was negligent in failing to ensure Munn used protective measures to prevent insect-borne infection; (3) Munn was infected by an insect-borne disease while visiting Mount Panshan; (4) one or more of Hotchkiss's negligent acts or omissions was the cause in fact of Munn's injuries; and (5) Hotchkiss's negligent acts or omissions were a substantial factor that, acting

---

2. It should be noted that there was disagreement over the geographic area specified, and thus preserved for argument, in Hotchkiss's Rule 50(a) motion. *Compare* Trial Tr. 1201:6–17 *with* Mot. Hr'g Tr. 3:20–24, 5:4–6:9 (July 11, 2013) (discussing the breadth of

Hotchkiss's oral motion for judgment as a matter of law at trial and whether that motion lacked sufficient specificity under Rule 50 to preserve several issues raised in Hotchkiss's post-trial filings).

alone or in conjunction with other factors, brought about Munn's injuries. Jury Verdict Form 1–2 (doc. 193). The jury further found that Munn had not contributed to her injuries, and it awarded Munn $450,000 in past economic damages, $9,800,000 in future economic damages, and $31,500,000 in non-economic damages. *Id.* at 2. Judgment entered for the Munns on April 9, 2013.

Hotchkiss then filed its renewed motion for judgment as a matter of law pursuant to Rule 50(b) (doc. 206), and in the alternative, for a new trial and to alter judgment pursuant to Rule 59 (docs. 207, 210). I heard argument on all three post-trial motions on July 11, 2013 (doc. 248).

## II. Standard of Review

Rule 50(b) of the Federal Rules of Civil Procedure allows for the entry of judgment as a matter of law if a jury returns a verdict for which there is no legally sufficient evidentiary basis. *See* Fed.R.Civ.P. 50. The standard under Rule 50 is the same as that for summary judgment: A court may not grant a Rule 50 motion unless "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 142 (2d Cir.1998) (citation and internal quotation marks omitted). Thus, in deciding such a motion, "the court must give deference to all credibility determinations and reasonable inferences of the jury ... and it may not itself weigh the credibility of the witnesses or consider the weight of the evidence." *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir.1998) (citations omitted). In short, the court cannot "substitute its judgment for that of the jury." *LeBlanc–*

*Sternberg v. Fletcher*, 67 F.3d 412, 429 (2d Cir.1995) (citations omitted). Rather, judgment as a matter of law may only be granted if:

(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or

(2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it.

*Galdieri–Ambrosini*, 136 F.3d at 289 (quoting *Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1154 (2d Cir.1994)) (internal quotation marks omitted); *see also Luciano v. Olsten Corp.*, 110 F.3d 210, 214 (2d Cir.1997).

In contrast, the decision whether to grant a new trial following a jury trial under Rule 59 is " 'committed to the sound discretion of the trial judge.' " *Stoma v. Miller Marine Servs., Inc.*, 271 F.Supp.2d 429, 431 (E.D.N.Y.2003) (quoting *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir.1992)). A new trial " 'should be granted when, in the opinion of the district court, the jury reached a seriously erroneous result or ... the verdict is a miscarriage of justice.' " *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir.1998) (quoting *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1047 (2d Cir.1992)). "A new trial may be granted, therefore, when the jury's verdict is against the weight of the evidence." *Id.*

Hotchkiss advances several related arguments in each motion. In its Rule 50(b) motion, Hotchkiss argues (1) the Munns did not present sufficient evidence that Cara Munn's injury was foreseeable, *see infra* section III.A.2.a; (2) public policy bars liability in this case, *see infra* section III.A.5; and (3) the Munns did not present

sufficient evidence to prove Cara Munn was infected during the trip to Mount Panshan, *see infra* section III.A.3. In its Rule 59 motion, Hotchkiss argues (1) the jury instruction on foreseeability misstated the law, *see infra* section III.A.2.b; (2) the court improperly excluded evidence of Mr. and Mrs. Munns' contributory negligence, including exclusion of release language in the school's waiver, *see infra* section III.A.4; (3) the court erroneously admitted some expert testimony and improperly excluded other testimony, *see infra* section III.B; and (4) the non-economic damages awarded by the jury were excessive, *see infra* section III.C.

## III. Discussion

In this section, I address each of Hotchkiss's arguments: (1) the scope of Connecticut law governing duty and foreseeability in an action for common law negligence, including the challenge to the jury's factual determinations and the jury instructions concerning foreseeability; (2) Hotchkiss's assertion that the Munns failed to demonstrate that Munn was infected during the trip to Mount Panshan, effectively an argument against cause in fact; (3) arguments regarding the Munns' alleged contributory negligence; (4) the assertion that public policy requires vacating the jury's verdict; (5) challenges to the court's decision to include certain experts and exclude others; (6) the contention that the jury's award for non-economic damages is excessive as a matter of law; and (7) the request to alter judgment in light of the parties' joint stipulation regarding collateral source reduction.

A. *Duty to Take Precautions, Foreseeability, Causation and Public Policy*

■ In order to make a prima facie case of negligence under Connecticut law, a plaintiff must show that a duty existed, that the breach of that duty caused the plaintiff's injuries, and that the plaintiff experienced actual harm or injury. *Considine v. City of Waterbury*, 279 Conn. 830, 858, 905 A.2d 70 (2006) (citations and quotation marks omitted). Within the element of causation, the individual or entity owing a duty to another is only liable for failing to prevent foreseeable harms that are the cause in fact of the plaintiff's injuries. *LePage v. Horne*, 262 Conn. 116, 124, 809 A.2d 505 (2002) (foreseeability); *Gomes v. Com. Union Ins. Co.*, 258 Conn. 603, 615, 783 A.2d 462 (2001) (foreseeability); *Paige v. St. Andrew's Roman Catholic Church Corp.*, 250 Conn. 14, 24–25, 734 A.2d 85 (1999) (discussing the interplay of cause in fact and proximate cause); *Kowal v. Hofher*, 181 Conn. 355, 359, 436 A.2d 1 (1980) (cause in fact).

In its post-trial motions, Hotchkiss conflates the concepts of the existence and scope of one's duty with the separate element of proximate causation. Hotchkiss does not challenge the jury's determination that Munn was harmed, but it contests that its alleged negligence was the proximate cause or cause in fact of Munn's injuries. Finally, Hotchkiss argues that even if the jury's determinations regarding scope of duty, foreseeability, and causation are reasonable as a matter of law, it should be relieved from negligence liability for public policy reasons. In this subsection, I evaluate those elements and their designations as either questions of law or questions of fact, as well as Hotchkiss's public policy defense.

### 1. *Duty*

■ The Connecticut Supreme Court explains that in a claim of general negligence, "it is necessary to determine the existence of a duty, and then, if one is found ... to evaluate the scope of that duty." *Maffucci v. Royal Park Ltd. P'ship,*

243 Conn. 552, 566, 707 A.2d 15 (1998) (internal citations and quotation marks omitted). Whether a duty exists is a question of law, but the scope of that duty and whether the defendant acted as "a reasonable person would have done under the circumstances is a question to be determined by the trier of fact, except where the [defendant's] conduct 'clearly has or has not conformed to what the community requires, [such] that no reasonable [trier of fact] could reach a contrary conclusion.'" *Considine,* 279 Conn. at 859, 905 A.2d 70 (citing William Lloyd Prosser & W. Page Keeton, *On Torts* § 37 (5th ed.1984)); *RK Constructors, Inc. v. Fusco Corp.,* 231 Conn. 381, 384–85, 650 A.2d 153 (1994) (citations and quotation marks omitted). Hotchkiss attempts to argue that it bore no legal duty to Munn because it could not have foreseen the risk of students contracting insect-borne diseases, and TBE in particular, during its China summer program.

■■■ As a matter of law, Hotchkiss undoubtedly owed Munn, a minor child in its care, a duty to protect her from known threats to her health and safety during the 2007 China summer program trip. Every public school shares this common-sense duty to protect the health and safety of students in its care, Connecticut General Statutes § 10–220, but this duty may be heightened for boarding schools, institutions that accept responsibility for students' well being. *Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 654–55, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995); *cf. Loomis Inst. v. Town of Windsor,* 234 Conn. 169, 172, 661 A.2d 1001 (1995) (reasoning that on-campus "faculty members, unlike off campus faculty members, act in loco parentis to boarding students and must be available on a twenty-four hour basis to take care of any problems that may occur at the school."); *accord Andreozzi v. Ru-*

*bano,* 145 Conn. 280, 282, 141 A.2d 639 (1958) (holding that teachers "stand in loco parentis toward a pupil" in matters of discipline and security). Further, a boarding school may create a legal duty by its representations to students and their parents/guardians, particularly in the provision of health services. *Bhagwant v. Kent School Corp.,* 453 F.Supp.2d 444 (D.Conn. 2006); *see also* Trial Tr. 125:6–128:5 (detailing Hotchkiss's pervasive supervision and control of its students). Regardless of the supervisory relationship between school and student, at a minimum Hotchkiss has a legal duty "to use care ... [in] circumstances under which a reasonable person [in the defendant's position], knowing what he knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result from his act or failure to act." *Ryan Transp., Inc. v. M & G Assocs.,* 266 Conn. 520, 525–26, 832 A.2d 1180 (2003); *Gomes,* 258 Conn. at 615, 783 A.2d 462; *Coburn v. Lenox Homes, Inc.,* 186 Conn. 370, 375, 441 A.2d 620 (1982).

Hotchkiss admits that it owes students in its travel-abroad programs a general duty of care to advise them of the foreseeable risks of, and strategies for preventing contraction of, insect-borne diseases. At trial, Head of School Malcolm McKenzie testified that the school has "an unquestionable duty to protect the kids from dangerous conditions and injuries" wherever it can. Trial Tr. 118:22–119:1. McKenzie further testified that the school warns students of the risk of malaria in tropical regions, including in its materials to students regarding the China trip and in certain other cases, and it requires students to take steps to prevent infection. Trial Tr. 113:24–114:13, 123:18–124:2, 124:13–125:5. Thompson also affirmed that the school had a duty to determine if there were disease risks on the trip and specifically to protect Munn against insect-borne

disease. Trial Tr. 235:16–17, 235:24–236:12; *see also* Trial Tr. 325:24–326:4 ("Q: Do you agree that the school had an unquestionable duty to protect Cara against insect-borne disease while on the trip? A: As much as that is possible through information and advice and direction.").

Further, Hotchkiss embraces its duty of care at its own campus in Lakeville, Connecticut. The school provides comprehensive information on the risks of insect-borne diseases on its campus, and it requires that students take precautions against insect-borne diseases, even when those diseases may impose moderate to serious harms, as opposed to the serious and severe harms caused by TBE.[3] Trial Tr. 155:7–156:9, 305:20–306:13, 313:14–18.

 Hotchkiss's arguments regarding want of a legal duty are more properly understood as a challenge to the jury's factual determination that Hotchkiss had a duty of care to participants in its 2007 summer China program to warn the Munns of the potential risks of insect-borne diseases and advise Munn of precautions against contracting an insect-borne disease. Connecticut state courts have consistently held that determining the scope of one's duty, also known as the standard of care, is fundamentally a question of fact. *Considine*, 279 Conn. at 859; 905 A.2d 70; *Maffucci*, 243 Conn. at 566, 707 A.2d 15; *accord LePage*, 262 Conn. at 123, 809 A.2d 505; *Michaud v. Gurney*, 168 Conn. 431, 434, 362 A.2d 857 (1975) ("negligence . . . requires the trier of fact to determine whether the standard of care was met in a specific situation").

 This case required, and employed evidence from, numerous experts who attempted to establish the parameters of what a reasonable school in Hotchkiss's position "knew or should have known" regarding the standard of care. As discussed in depth *infra* section III.B (Expert Witnesses), a district judge plays a gatekeeper role in its admission or exclusion of expert testimony, but once admitted, any other questions regarding an expert's opinion, testimony or qualifications go to the weight and credibility of that expert—questions reserved for the jury. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ("The Rules were designed to depend primarily upon lawyer-adversaries and sensible triers of fact to evaluate conflicts." Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 1 (1991)); *cf. W. Air Lines, Inc. v. Criswell*, 472 U.S. 400, 423, 105 S.Ct. 2743, 86 L.Ed.2d 321 (1985) (noting that it is improper to give all expert opinions equal weight because this eliminates the function of the jury in evaluating conflicting testimony); *see also Davis v. Margolis,* 215

---

**3.** Hotchkiss now argues that Lyme disease is not a dangerous disease, and, thus, is not comparable to TBE. This is a surprising position given that the school treats the presence of Lyme disease on its own grounds in Lakeville, Connecticut, as a serious threat to student health. Trial Tr. 127:9–13 ("Q: And do you know what the consequences of Lyme disease are? A: They are varied. Q: Yes. They can be very serious? A: They can be serious."), 305:20–306:13. Indeed, students are not allowed to enter Hotchkiss's woods without taking precautions against insect bites, including applying bug spray and wearing covered shoes. Trial Tr. 313:14–18 ("Q: And so, if you're out on Eco Day with a group of students, you've instructed them that they need to wear boots in the woods and they end up in flip flops; you sent them back to the school? A: That's certainly been my practice."). Hotchkiss's new position is unpersuasive; the comparative severity of Lyme disease and TBE is irrelevant to whether the school itself owed a general duty of care to its students regarding the contraction, and prevention of contraction, of insect-borne diseases.

Conn. 408, 417, 576 A.2d 489 (1990) (citing *Sanderson v. Bob's Coaster Corp.*, 133 Conn. 677, 682, 54 A.2d 270 (1947)); *Johnson v. Chaves*, 78 Conn.App. 342, 346–47, 826 A.2d 1286, *cert. denied*, 266 Conn. 911, 832 A.2d 70 (2003); *Sorenson Transp. Co., Inc. v. State of Conn.*, 3 Conn.App. 329, 332, 488 A.2d 458, *cert. denied*, 196 Conn. 801, 491 A.2d 1105 (1985). Moreover, when there is a disagreement among qualified experts who meet *Daubert's* requirements for admission, there is necessarily a disputed factual issue that requires resolution by the trier of fact.

 A court may only vacate the jury's determination regarding the standard of care if the defendant's "conduct clearly has or has not conformed to what the community requires" such that no reasonable trier of fact could reach a contrary conclusion, *Considine*, 279 Conn. at 859, 905 A.2d 70, or "if . . . the evidence is so weak that it would be proper for the court to set aside a verdict rendered for another party." *Santopietro v. City of New Haven*, 239 Conn. 207, 225–26, 682 A.2d 106 (1996). As discussed in depth *infra* in section III.A.2 (Foreseeability), this is not a case in which either provision for vacating a jury's verdict is appropriate. Hotchkiss cannot demonstrate that its behavior "clearly conformed" to community standards, nor is it appropriate for the court to substitute its judgment for the jury's factual determinations. *Galdieri–Ambrosini*, 136 F.3d at 289; *LeBlanc–Sternberg*, 67 F.3d at 429. This case involved difficult issues of fact that required a jury to weigh the evidence, evaluate the credibility of witnesses and determine the community's standards regarding the scope of Hotchkiss's duty to Munn (i.e., the standard of care). After taking on the difficult task of assessing duty and liability, the jury returned a verdict unfavorable to Hotchkiss. Hotchkiss has not provided an adequate or

reasonable rationale for vacating the verdict in this case.

Hotchkiss next argues that it could not have breached its standard of care because Munn's infection was unforeseeable. This argument is also unavailing.

### 2. Foreseeability

 Connecticut law limits the bounds of tort liability by restricting liability to those harms that are foreseeable. *LePage*, 262 Conn. at 124, 809 A.2d 505 (citing *Gomes*, 258 Conn. at 615, 783 A.2d 462). Foreseeability does not turn on the narrow question whether the plaintiff's specific harm was foreseeable to the defendant; it asks "would the ordinary [person] in the defendant's position, knowing what he knew or should have known, anticipate the *harm of the general nature of that suffered* was likely to result?" *Id.* (emphasis added); *Conn. Sav. Bank v. First Nat'l Bank & Trust Co.*, 138 Conn. 298, 303–04, 84 A.2d 267 (1951) (citing *Orlo v. Conn. Co.*, 128 Conn. 231, 237, 21 A.2d 402 (1941)). As discussed *supra* in section III.A.1 (Duty), although the existence of a duty is usually a question of law, the narrow question of foreseeability often turns on the facts of a particular case. *Stewart v. Federated Dept. Stores, Inc.*, 234 Conn. 597, 613, 662 A.2d 753 (1995) (when evidence supports finding that injury was within foreseeable scope of duty, issue involved question of fact for the jury, not question of law); *Frankovitch v. Burton*, 185 Conn. 14, 21, 440 A.2d 254 (1981) ("[w]hether the defendant should have anticipated danger . . . present[s] a question of fact."); *Gutierrez v. Thorne*, 13 Conn. App. 493, 501, 537 A.2d 527 (1988) ("if there is room for a reasonable disagreement [regarding foreseeability of an injury], the question is one to be determined by the trier as a matter of fact." (internal citations omitted)); *Vendrella v. Astriab Family Ltd. P'ship*, 311 Conn. 301, 329, 87

A.3d 546 (2014) ("[w]hether an injury was foreseeable is to be determined by the jury").[4] Moreover, although Connecticut courts are concerned with questions of public policy, a trial court must determine foreseeability before turning to a public policy analysis. *Monk v. Temple George Assocs., LLC,* 273 Conn. 108, 114, 869 A.2d 179 (2005) ("before addressing policy concerns . . . we must first determine under the foreseeability prong whether a duty existed . . . absent other considerations."); *see also infra* section III.A.5 (Public Policy).

In this case, the jury determined that Hotchkiss knew or should have known that Munn could contract an insect-borne disease in China, specifically, on Mount Panshan. It was a pivotal finding. According to the jury, as the students gathered in the parking lot at the base of Mount Panshan, Hotchkiss faculty knew, or should have known, that the students were about to enter an area populated by insects carrying diseases. Jury Verdict Form 1.

Thus, for Hotchkiss to prevail on this issue, it must overcome the jury's determination in one of two ways. First, it can unsettle the jury's factual determinations, either by showing that the jury misjudged the sufficiency of the evidence of foreseeability or by demonstrating that the jury was misled by the court's description of the law governing foreseeability. Second, Hotchkiss can argue that despite the foreseeability of the risk, it had no legal duty to protect students from known diseases when traveling abroad.

### a. Sufficiency of the Evidence of Foreseeability

Foreseeability encourages those owing a duty to others to take precautions to minimize identifiable risks while limiting tort liability from risks that are so "novel or extraordinary" that they could not be anticipated. *Schiavone v. Falango,* 149 Conn. 293, 298, 179 A.2d 622 (1962); *Palsgraf v. Long Isl. R.R. Co.,* 248 N.Y. 339, 345–47, 162 N.E. 99 (1928); *see also* Prosser & Keeton, *On Torts* § 31 ("The idea of risk . . . necessarily involves a recognizable danger, based upon some knowledge of the existing facts, and some reasonable belief that harm may follow."). The test of foreseeability is not limited to whether a specific harm could have resulted from the defendant's conduct; instead, it determines whether the injury suffered

---

**4.** This rule is necessary because foreseeability infuses several elements of a negligence action; it defines the scope of the duty owed and the limits of proximate cause. *Malloy v. Town of Colchester,* 85 Conn.App. 627, 633–34, 858 A.2d 813, *cert. denied,* 272 Conn. 907, 863 A.2d 698 (2004) (explaining that in many cases "the question of legal causation is practically indistinguishable from an analysis of the extent of the tortfeasor's duty to the plaintiff." (citations and quotations omitted)).

Here, Hotchkiss has cast foreseeability principally as a question of duty, a mixed question of law and fact, rather than as proximate cause, a question of fact. *B & D Assocs., Inc. v. Russell,* 73 Conn.App. 66, 77, 807 A.2d 1001 (2002). This is an understandable tack for a party facing the difficult burden of overcoming a jury verdict. But a change in terminology does not change the character of the question posed to the court: what a reasonable person would have anticipated if placed in the defendant's situation. That determination turns on facts—what information was available to the defendant, where the defendant planned to take the plaintiff, what medical professionals would have advised the defendant, etc.—and factual disputes must be resolved by a jury. *See Miranti v. Brookside,* 159 Conn. 24, 29, 266 A.2d 370 (1969) (reversing grant of summary judgment because contested issues of fact existed with respect to whether accumulation of debris created foreseeable risk of accident); *Frankovitch,* 185 Conn. at 15–16, 440 A.2d 254 ("[i]f, on the evidence, the jury could reasonably have decided as they did, we will not find error in the trial court's acceptance of the verdict.").

falls within a reasonably foreseeable category of potential risks or harms. *Allen v. Cox,* 285 · Conn. 603, 610, 942 A.2d 296 (2008); *Jaworski v. Kiernan,* 241 Conn. 399, 405, 696 A.2d 332 (1997) (noting that the test of foreseeability is "harm of the general nature suffered"); *Frankovitch,* 185 Conn. at 21, 440 A.2d 254 ("[it] is not meant that one charged with negligence must be found actually to have foreseen ... the particular injury that resulted was foreseeable"); *see also Vendrella,* 311 Conn. at 335 n. 27, 87 A.3d 546 ("by logical deduction, the foreseeability component of the duty analysis must be something different than the foreseeability component of proximate cause. More precisely, it must be a lesser inquiry;" that ·is, a lesser burden) ·(internal citations omitted).

Hotchkiss asks this court to depart from longstanding Connecticut law by imposing a higher burden of proof on the plaintiffs. Hotchkiss argues that the Munns must prove that the precise injury Munn actually sustained, TBE, was specifically foreseeable, not that the general category of harm to which she was exposed—insect-borne disease—was foreseeable and thus fell within the scope of Hotchkiss's duty to students on its China trip. This argument is an unprecedented departure from case law, and as such, it is unavailing.

Munn's health was compromised the moment an insect, in a zone known to be a risk area for insect-borne diseases, latched onto her arm and infected her. That insect happened to be a tick, and it happened to carry TBE. But Munn likely would have suffered severe harm if she contracted a different insect-borne disease; for example, if a mosquito injected her

with the malaria virus, or a flea transmitted the bubonic plague. To hold otherwise conflates two distinct concepts: "harm" as a trigger for legal liability, and "harm" as a measure of damages.

■ A person commits a tort when he imprudently fails to foresee and take precautions against a risk that he should have recognized, and another person suffers an injury as the result of that failure. *LePage,* 262 Conn. at 124, 809 A.2d 505 ("the factfinder must consider whether the defendant knew, or should have known, the situation at hand would 'obviously and naturally, even though not necessarily, expose [the plaintiff] to probable injury unless preventive measures were taken.'") (citing *Bonczkiewicz v. Merberg Wrecking Corp.,* 148 Conn. 573, 579, 172 A.2d 917 (1961)). That injury is the "harm" or risk that the defendant should have foreseen, and, in this case, it occurred the moment a tick bit into Munn's skin and transmitted a disease that compromised her health. That injury had extreme consequences, so that the total "harm" for which the Munns sought compensation is substantial. But the preventable legal injury at issue was Munn's infection by an insect, not her specific illness.[5] Thus, the jury properly determined that Hotchkiss had a duty to warn Munn and ensure that she took protective measures to prevent that category of injury described to the jury as "insect-borne disease." Jury Verdict Form 2.

*Jaworski v. Kiernan* illustrates how the Connecticut Supreme Court has distinguished between foreseeability of a category or class of injuries from foreseeability of specific injuries. In *Jaworski,* the Court held that players can and should

---

**5.** A related doctrine underscores this point: To establish proximate cause, a plaintiff need only prove that a defendant's conduct is a "substantial factor in bringing about harm to another," and does not need to establish that

"the actor ... should have foreseen the extent of the harm or the manner in which it occurred." *Restatement (Second) of Torts* § 435(1).

foresee the risk of bodily injury to competitors during a soccer game. 241 Conn. at 408, 696 A.2d 332. The defendant had tripped the plaintiff in an attempt to gain possession of a ball during a soccer game. *Id.* at 400, 696 A.2d 332. The plaintiff fell and tore a ligament, resulting in a permanent injury to her left knee. *Id.* On appeal, the Court held that the harm to the plaintiff was foreseeable because athletes should know that aggressive play increases the chance of injuries to fellow players. *Id.* To reach this result, the Court defined the foreseeable risk as injury resulting from contact on the field, not of severe damage to a knee that results from tripping a competitor:

> Soccer, while not as violent a sport as football, is nevertheless replete with occasions when the participants make contact with one another during the normal course of the game. When two soccer players vie for control of the ball, the lower limbs are especially vulnerable to injury. If a player seeks to challenge another player who has possession of the ball or seeks to prevent another player from gaining possession of the ball, the resulting contact could reasonably be foreseen to result in injury to either player. We conclude, therefore, that the plaintiff's injury was foreseeable.

*Id.* at 408, 696 A.2d 332. Like the hard-tackling soccer player in *Jaworski,* the jury here determined that Hotchkiss could have foreseen that its conduct might cause injury, even if it could not have anticipated the severity of the harm.

Hotchkiss rejects this interpretation of Connecticut law. It attempts to create a narrower rule by referencing a Connecticut Supreme Court decision, *Lodge v. Arett Sales Corp.,* 246 Conn. 563, 717 A.2d 215 (1998), in which the Court held that defendants could not have anticipated the tertiary effects of their conduct. In *Lodge,* a group of injured firefighters sued alarm companies that transmitted false alerts. As the firefighters raced to a location where they were not needed, the brakes on their fire engine failed, and the vehicle careened into a tree. *Id.* at 567, 717 A.2d 215. After a jury returned a verdict in favor of the accident victims, the Connecticut Supreme Court vacated the award because the alarm companies could not have foreseen that the vehicle would have faulty brakes, even if the companies had carelessly transmitted a signal that put the firefighters on a path that ended in a crash. *Id.* at 574, 717 A.2d 215. The Court described its holding as based on the scope of the injury, writing that "[w]e agree with the defendants that the analysis of foreseeability logically cannot be extended so far that the term 'general harm' incorporates any accident involving a fire engine responding to a false alarm."[6] *Id.*

The holding in *Lodge,* however, is fundamentally concerned with cause in fact, not the scope of duty. *Id.* (a court should examine duty in the context of causation when "the duty is asserted against one who is not the direct cause of the harm"). In *Lodge,* the alarm company's behavior could not be traced back to the fire engine's brake failure; the alarm company had not serviced or replaced the brakes, nor could it have known that the brakes were kept in poor repair. *Id.* at 577–78,

**6.** In dicta the Connecticut Supreme Court noted that if the firefighters had suffered an accident unrelated to their faulty brakes—for example, from speeding or from abrupt traffic changes in response to an emergency vehicle—the alarm companies may have been liable for those injuries. *Lodge,* 246 Conn. at 578–79, 717 A.2d 215. That suggestion further supports the interpretation that the *Lodge* court was primarily concerned with superseding or intervening causes of harm, not with foreseeability as a standalone issue.

717 A.2d 215. The Court ·ultimately decided that the plaintiffs' harm was too attenuated from the defendant's conduct to reasonably apply legal liability. *Id.* at 574, 577, 717 A.2d 215. Although the Court framed the plaintiffs' harm as "too remote" from the defendant's conduct to require liability, "remote" was used to describe the closeness of the relationship between the plaintiffs' harm and the defendant's conduct, not to refer to the probability, or improbability, of that harm occurring. *Id.* at 575, 717 A.2d 215. Ultimately, the Court indicated that the plaintiffs had sued the wrong defendant, not that the anticipated harm was unforeseeable if liability were asserted against another defendant under the same circumstances. *Id.* at 578–79, 717 A.2d 215.

No third party's negligence distances Hotchkiss from Munn's infection. The Munns' claim was directly related to Hotchkiss's conduct and the impact of that conduct on Munn's exposure to a foreseeable risk. Munn argued that the school should have warned her of, and advised and ensured she took protective measures against, the risk of insect-borne disease. Because the school ignored the threat of insect-borne diseases, Munn walked down Mount Panshan without any protection against insects carrying diseases, including ticks carrying TBE.

In contrast, the *Lodge* plaintiffs' argument required several logical leaps to connect their injuries to the alarm companies' negligence: the companies had a duty to send accurate information, but they could not have anticipated that their false signal would reach a fire station serviced by a fire engine with poorly-maintained brakes that prevented a driver from stopping the vehicle before it skidded toward a tree. *Id.* at 577–78, 717 A.2d 215 (noting that the poor maintenance of the vehicle was beyond the control of the alarm company). The *Lodge* plaintiffs could not argue that they would have avoided an accident had the defendants sent only accurate alarm reports.

Conversely, in this case the jury found that Munn demonstrated that, but for Hotchkiss's negligence, she would have applied bug spray that would properly repel insects, and as a result, prevent her from contracting insect-borne diseases like TBE. At trial, Hotchkiss advanced arguments and offered evidence to muddy the alleged causal connection between its conduct and Munn's injuries by alleging that Munn was comparatively negligent and offering expert testimony that Munn may have contracted a different form of encephalitis in a different location.[7] The issue here was not whether Hotchkiss was being held responsible for another party's conduct; instead, there was a factual dispute regarding causation, and that dispute required expert testimony and exhibits from both parties.

Once the scope of Hotchkiss's duty was defined—as an obligation to protect students from insects carrying disease—the jury was provided with ample evidence that the school ignored a predictable risk within the scope of its duty to Munn. First, the CDC warned travelers about many insect-borne diseases in China. Pls.' Trial

---

7. Hotchkiss's alternative theories were that Munn consumed unpasteurized milk products that could have transmitted TBE or that Munn contracted Powassan virus. Mot. Hr'g Tr. 17:6–19:21 (Feb. 26, 2013); Pretrial Conf. Tr. 2:18–3:10 (Mar. 13, 2013); Trial Tr. 1236:14–1238:24; Mot. Hr'g Tr. 6:10–15. Hotchkiss proffered no evidence to substantiate its unpasteurized dairy product theory, and ultimately I excluded introduction of that theory as unduly prejudicial and insufficiently probative, but I allowed Hotchkiss to introduce expert testimony regarding Powassan virus. Pretrial Conf. Tr. 2:20–3:7 (Mar. 13, 2013) (allowing expert testimony on Powassan virus).

Ex. 9, at 2–4. As witnesses for both sides attested, the CDC is the primary source for assessing travelers' health risks abroad.[8] Indeed, Thompson testified that he based much of the school's pre-trip advice on the CDC website. Trial Tr. 235:10–14. At trial, the Munns presented two CDC advisories about disease risks in China. The first advisory described health risks in "East Asia." Pls.' Trial Ex. 9. That advisory warned of malaria in "some areas of China" and that "dengue, filariasis, Japanese encephalitis, leishmaniasis, and plague are diseases carried by insects ... in this region." *Id.* at 3. It also counseled travelers to bring "[i]nsect repellant containing DEET" and "long-sleeved shirt[s] [and] long pants" to prevent contracting insect-borne disease. *Id.* at 4. The second advisory outlined risks in China specifically. Def.'s Trial Ex. 546. That webpage advised travelers about risks of Japanese encephalitis, malaria, leishmaniasis, and, most relevant, TBE; it stated that "[t]ickborne encephalitis occurs in forested regions in northeastern China." [9] *Id.* It then repeated the advice on insect precautions found on the East Asia webpage—travelers should use DEET-based bug repellant and wear long pants and long sleeves when outdoors.[10] *Id.*

With this foundation laid, the Munns presented evidence that Mount Panshan fell within the category of geographies described in the CDC's warnings—a forested region in northeastern China. Photographs and video depicted a mountain covered with dense patches of trees and

---

**8.** According to defense expert Dr. David Freedman, "the CDC is the [source] that would be regarded as the standard for [travel medicine advice] ... I mean the CDC are our national guidelines for travel medicine." Trial Tr. 1242:9–13. Thompson agreed: "The standard [sources] that we reference are the CDC, that's the first and foremost." Trial Tr. 248:10–12. So did McKenzie: "[T]he obvious and primary [sources] in the U.S. would be the CDC and the State Department...." Trial Tr. 144:24–25, 144:7–11.

**9.** Other CDC sources contained conflicting findings on the risk of insect-borne diseases to travelers in certain areas of China. In a 2008 report, Freedman and his co-authors noted that they had not found any reported cases of insect-borne disease amongst foreign travelers visiting clinics after a trip to China. Def.'s Trial Ex. 542. The jury heard this evidence and likely found the CDC's widely-available webpage on China to be persuasive evidence that the risk of contracting TBE and other insect-borne diseases was foreseeable.

**10.** Although Hotchkiss conceded to the admission of defense exhibit 546 at trial, it now argues in its post-trial motions that the China advisory should be discounted because it was dated December 2007, five months after Munn returned from China. Trial Tr. 251:4–14. But that date is misleading: the last page of the advisory states that the page was "last reviewed," "last modified," and "created" on "August 01, 2007," just weeks after Munn became sick in China. Def.'s Trial Ex. 436; Mot. Hr'g Tr. 45:21–46:7 (July 11, 2013).

The jury could easily and reasonably have inferred that the August 2007 webpage contained the same basic information as the late spring 2007 page. The CDC had a China page at the time Thompson and Yu planned the trip—indeed, Thompson testified that Yu had mistakenly included a link to the CDC's Central America page in her April email and had meant to link to the China page. Trial Tr. 241:4–20, 255:2–10. Thompson also testified that he recalled the warning about TBE appearing on that webpage, though he equivocated over whether advice on TBE was applicable to the geographic locations of the Hotchkiss trip. Trial Tr. 249:9–20, 253:12–19. There was no evidence of a spike in TBE infections in northeastern China between the late spring and summer of 2007. Munn was only diagnosed with TBE months after her return from China. Def.'s Trial Ex. 569. Thus, contrary to Hotchkiss's argument, any reference to TBE in the 2007 advisory could not have been new nor could it refer to Munn's case. The jury could reasonably infer that the earlier page would have contained similar advice to what it saw in the August 2007 version.

brush. Pls.' Trial Ex. 20; Def.'s Trial Exs. 405, 614. The jury heard a debate about whether Mount Panshan fell within northeastern China or should be treated as a northern portion of central-eastern China. The Munns displayed a map that placed Mount Panshan at the northern end of Tianjin, above the Bohai Sea, Pls.' Trial Ex. 14, and a second map that placed northern Tianjin within the TBE-endemic region in China, a band whose southern tip ended at the Bohai Sea. Pls.' Trial Ex. 22; Trial Tr. 679:9–25. Thus, the jury reasonably could have interpreted those maps to establish that Mount Panshan fell within the area described as "northeastern China" in the CDC's advisory. Hotchkiss's witnesses bolstered this interpretation. Thompson conceded that Tianjin lay in northeastern China. Trial Tr. 253:12–14 (Q: "When we talked about it a minute ago, you agreed we were in Northeastern China" A: "Yes, sir."). Dr. David Freedman, Hotchkiss's only expert on liability, testified that he was unfamiliar with the CDC's mention of Tianjin as part of China's northeastern provinces, Trial Tr. 1247:1–4, but he then equivocated, admitting bluntly that "Tianjin is in northeastern China." Trial Tr. 1247:5–6. On cross-examination, he also admitted that the Munns' map, placing Mount Panshan in northeastern China's TBE-endemic region, was authoritative; indeed, it was so reliable it had appeared in a travel medicine textbook edited by Freedman. Trial Tr. 1262:7–1264:15.

Even if the jury had found the CDC evidence inconclusive, expert opinion also supported a finding of foreseeability. Both travel medicine experts testified that the school had reason to know and be wary of insect-borne diseases in the region. Dr. Stuart Rose, the Munns' expert, testified that, according to travel medicine reports routinely consulted by doctors and commercial trip planners in 2007, rural China was an endemic region for TBE, Japanese encephalitis, and Lyme disease. Trial Tr. 650:21–651:7, 655:19–656:4.[11] Rose opined that any competent trip planner would have understood the risk of these diseases; would have warned children in advance of their hike on Mount Panshan that they had to wear DEET-based repellant, long sleeves and long pants; and would have checked for ticks at the conclusion of their excursion. Trial Tr. 681:4–683:8.

Freedman's testimony also supported a finding of foreseeability regarding insect-borne diseases. Freedman testified that he had "a very strong opinion" that the school had done nothing wrong, that if "Cara would have presented to [his] travel medicine clinic ... she would have gotten exactly the same advice as she did receive." Trial Tr. 1231:8–11. During direct and cross-examination, however, he also admitted facts that permitted an inference in favor of the Munns: Freedman admitted that Lyme disease and Japanese encephalitis could be found in Tianjin. Trial Tr. 1243:25–1245:5, 1254:20–1255:19. He further conceded that TBE was present in Tianjin. Trial Tr. 1222:24–1223:6 ("There were clearly, there are clearly—there are clearly cases in the local population during that time.... It's not a nationally tracked disease in China."). He then admitted that the school was on notice of that risk; after the Munns' counsel pressed him on whether the school should have heeded the CDC's warning, Freedman grudgingly responded that "all I can say is that [TBE] is

---

**11.** Rose relied upon a report issued by Shoreland Travax, a popular commercial service consulted by travel medicine doctors and trip planners. The report was admitted as a learned treatise; thus its content was the subject of expert testimony, but it was not admitted as an exhibit. *See Fed.R.Evid.* 803(18).

something should concern you, that you might want to question [whether to take precautions against TBE] a little bit more." Trial Tr. 1253:2–12.

Munns' counsel put forth evidence that illuminated what the school would have found had it looked into the CDC's warning about the risk of TBE—the same advisory relied upon by Rose, which warned travelers about TBE in rural China and which was published by a widely-used commercial service. Trial Tr. 1250:1–12, 1253:13–22. Freedman could not undermine the advisory's accuracy; he sat on the commercial service's editorial board and approved all content for its website. Trial Tr. 1248:12–22. The Munns also submitted a British health advisory that counseled that TBE occurred "in forested regions of China and Japan." Def.'s Trial Ex. 604, at 1.

Faced with the task of overcoming this substantial evidence, Hotchkiss launches one final attack on the sufficiency of the Munns' case: Before Munn contracted TBE in summer 2007, the CDC had no record of an American traveler contracting the illness while visiting China. As it did at summary judgment and trial, Hotchkiss points to the unprecedented nature of Munn's illness as evidence that the illness was unforeseeable as a matter of law. If no one like Munn had contracted the illness before, the logic goes, how could the school anticipate that it would happen to her? According to Hotchkiss, then, Munn's illness was a "freak accident," not a foreseeable harm that the school had a duty to guard against. Trial Tr. 146:7–9.

The rarity or commonness of TBE only goes to the weight of factual evidence, not its legal sufficiency. As noted, the general category of harm at issue related to insect-borne diseases, within which certain diseases were more or less common. The jury found that Hotchkiss failed to meet its standard of care for this category of harm, and as a result, Munn contracted a rare but severe, insect-borne disease. This determination is fundamentally a factual inquiry.

Prior incidents are only one way of proving that a defendant should have anticipated harm. In *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80 (2d Cir.1997), the Second Circuit reversed a district court's grant of a motion for judgment as a matter of law. The district court had ruled that the plaintiff could not establish foreseeability if there was no evidence that a previous passenger had suffered a similar injury. The Second Circuit disagreed. Writing for the majority, Judge Guido Calabresi explained that "such evidence—though relevant—was not necessary to a showing of negligence in a particular case.... If there is sufficient other evidence of negligence, no evidence of prior accidents is required." *Id.* (internal citations omitted); *accord Pratt & Whitney Aircraft v. Donovan*, 715 F.2d 57, 63–64 (2d Cir.1983) (reasoning that "unusual or infrequent hazards undoubtedly can in some circumstances pose a meaningful possibility of injury"). Indeed, the relative rarity or commonness of a potential injury or harm is central to the calculus of negligence when setting a standard of reasonable care. *In re N.Y.C.*, 522 F.3d 279, 284 (2d Cir.2008) ("[W]e are mindful of the formula first stated by Judge Learned Hand in *United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir.1947): whether the burden of adequate precautions (B) is less than the gravity of the injury (L) discounted by the probability that the injury will occur (P), i.e., whether $B < PL$.") (Hand Rule).

■ At trial, Hotchkiss made persuasive arguments for why it could not have predicted the high price of a tick bite. Another jury might have hewed to Dr. Freedman's opinion or interpreted the

CDC advice as too vague to provide notice to the school. But the jury in this case did not; upon reviewing and weighing the evidence, it found that Hotchkiss should have foreseen the threat an insect-borne disease posed to Munn at Mount Panshan.

As discussed *infra* in section III.B, it is reasonable for the jury to have weighed this contradictory evidence and found Munn's theory and evidence more compelling than the school's alternative theories. The defendant has not provided a basis upon which to question the jury's considered judgment.

### b. Jury Instruction

Hotchkiss next argues that the court improperly instructed the jury on how to assess foreseeability. After I instructed the jury that a defendant can only be held liable for a known risk, I gave the jury some additional guidance to help them understand how to apply the legal concept of foreseeability. I noted that the jury should make an objective assessment whether a "reasonable" school would have anticipated harm. I explained that this was not a numbers game, because foreseeability was "not a question of strict probability." Jury Instructions 11. The Connecticut Supreme Court's case law guided this instruction. In *Jarmie v. Troncale*, 306 Conn. 578, 590, 50 A.3d 802 (2012), the Connecticut Supreme Court held:

> The ultimate test of the existence of the duty to use care is found in the foreseeability that harm may result if it is not exercised. . . . *By that is not meant that one charged with negligence must be found actually to have foreseen the probability of harm or that the particular injury which resulted was foreseeable,* but the test is, would the ordinary [person] in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result.

(internal citations and quotations omitted) (emphasis added). I further clarified that foreseeability depends in part on the salience of a risk; the instruction stated, "if the risk is an appreciable one, and the possible consequences are serious, the question is not one of mathematical probability alone." Jury Instructions 11.

■■■■ Hotchkiss does not contest any of these black-letter law instructions. It only attacks the sentence that followed: "As the gravity of the possible harm increases, the apparent likelihood of its occurrence need be correspondingly less to generate a duty of precaution." According to the school, the court committed a conceptual error, arguing that the sentence conflated the scope of a duty (i.e., how much a defendant must do to prevent harm) with whether a duty arises (i.e., whether a defendant could predict harm). Jury Instructions 12.

This argument fails for two reasons. First, the instruction is an accurate statement of the law governing foreseeability. *In re N.Y.C.*, 522 F.3d at 284; *Jarmie*, 306 Conn. at 590, 50 A.3d 802. A layperson might assume that foreseeability is equivalent to likelihood—that it depends on how frequently people confront a specific risk. But as the unchallenged portion of the instruction notes, people can anticipate harms even if those bad outcomes do not occur very often. Indeed, in a functioning tort system, reasonable people will take precautions against risks that rarely occur when those risks may result in great harm. Foreseeability, then, depends not only on probability, but also on other factors, such as the salience of a particular outcome. Serious consequences come to mind more readily than relatively minor consequences. That is all the challenged sentence captures—the common-sense notion

that people will get off the water in a lightning storm because they fear the rare but deadly consequence of electrocution, not because the bolts frequently strike boaters. *See* Prosser & Keeton, *On Torts* § 31 (reciting the challenged sentence of the jury instruction and citing to cases about highly-improbable accidents with serious consequences).

Courts have embraced Prosser and Keeton's straightforward proposition. As the Munns note, the Connecticut Supreme Court has used the language at issue to explain that "the likelihood of harm *must* be considered in conjunction with the gravity of harm." *LePage*, 262 Conn. at 131 n. 16, 809 A.2d 505 (relying on Prosser & Keeton) (emphasis in the original). The Second Circuit has noted that the gravity of a harm affects whether someone might reasonably anticipate an "unusual or infrequent hazard." *Pratt & Whitney Aircraft*, 715 F.2d at 63–64 (quoting Prosser & Keeton). The U.S. Court of Appeals for the Third Circuit and the California Supreme Court have also relied upon this commonsense rule. *Surace v. Caterpillar, Inc.*, 111 F.3d 1039, 1045 (3d Cir.1997); *John B. v. Super. Ct.*, 38 Cal.4th 1177, 1195, 45 Cal.Rptr.3d 316, 137 P.3d 153 (2006).

Hotchkiss appeared to incorporate the principle that salience affects risk perception in its preparation for the trip; it anticipated and warned students of other serious but remote risks in advance of the China trip. In its pre-trip departure manual, the school cautioned students about grave and unlikely medical risks, issuing two such warnings. "If you require surgery overseas and need a blood transfusion, remember that not all countries require the same standards for screening HIV-antibodies in donated blood," Hotchkiss instructed. Pls.' Trial Ex. 1, at 10. It counseled students to consult with the Red Cross regarding safe sources for blood.

*Id.* It further warned that students should be careful if they "chose to be sexually active overseas." *Id.* Foreign condoms, the school noted, "may not be manufactured and/or stored properly so as to provide maximum protection against sexually transmitted diseases" and advised students to "bring their own supply of condoms." *Id.*

Was there a precedent for a student sustaining an injury requiring surgery and contracting HIV from a tainted blood supply at an urban Chinese hospital? Probably not. Was it likely that a high school summer program participant might accidently contract a sexually-transmitted disease because the student used a faulty condom bought locally? The likelihood of such an event is slim. Despite the low probability of such harms occurring, Hotchkiss still anticipated those risks, and it warned students about them. It did so because the possible consequences of those unlikely risks were serious. In both situations, a student could contract serious diseases like HIV, a chronic, life-threatening condition that is controlled only by expensive drugs and constant medical supervision (although, especially with treatment, HIV/AIDS rarely leads to disabilities as severe as Munn's injuries). With those grave consequences in mind, the school rightly acted to protect its students.

 Second, even if the black-letter rule quoted in the jury instruction did not relate to foreseeability, read in the context of the surrounding text, it did not mislead the jury about how to define the scope of a duty. Jury instructions must be read as a whole and should be considered in light of the entire charge. *E.g., Hudson v. N.Y.C.*, 271 F.3d 62, 68 (2d Cir.2001). Hotchkiss does not argue that the challenged sentence misstates a legal principle; by its own admission, the sentence describes an aspect of legal duty. Hotchkiss makes a

distinction that departs from settled case law, arguing that foreseeability should be defined only by the likelihood of a harm occurring, not by whether a serious and knowable potential harm exists. Relying on this conceptual slip, Hotchkiss argues that the instruction compromised its defense because the jury could have mistakenly found it liable for an unforeseeable harm, for example, for "an earthquake in New York, or a tsunami in Rhode Island." Def.'s Mem. in Supp. of Combined Mots. 26 (doc. 208).

Even assuming that Hotchkiss is correct about how to properly frame the challenged sentence, the instruction could not have misled the jury enough to prejudice the school's case. The instruction on foreseeability began with a clear directive: "A defendant is not negligent unless he knew or reasonably should have known of a risk." Jury Instructions 11. It then repeated this boundary on liability: "the school can only be held responsible for failing to protect Cara against a risk that a reasonable school should have foreseen." *Id.* Thus, even if the contested sentence described the bounds of a duty (which it does not), it neither misstated the legal bounds of duty nor displaced an accurate statement of the foreseeability requirement because the jury was repeatedly instructed that Hotchkiss could not be held liable for an unpredictable harm. The jury was told that Hotchkiss was not responsible for harm that it could not foresee, and the jury found that the school could have predicted that there was a risk of students on the trip contracting insect-borne diseases.

### 3. *Causation*

Hotchkiss next argues that the plaintiffs failed to prove that Munn contracted TBE on Mount Panshan. Munn testified that she received numerous bug bites while on Mount Panshan and that she had a bite on her left arm that turned red and started to itch. Trial Tr. 1008:19–22. Munn developed the symptoms of encephalitis about ten days after the trip to Mount Panshan, which defense expert Freedman testified fell within the normal seven- to fourteen-day incubation period for TBE. Trial Tr. 1259:19–23 (Q: "[W]hen someone contracts a tick-borne encephalitis, it is more likely than not that they were bitten by the tick seven to 14 days before the symptoms show up? A: Yes, that is correct.").

■ Ticks usually live in wooded or grassy areas, Def.'s Trial Ex. 591, at 8, and Mount Panshan was the only place that Munn reported hiking through woods and tall grass. Trial Tr. 1008:23–1009:1. Yu testified that students had only complained about bugs at one other time—an evening at Nankai University when mosquitoes bit several people. Trial Tr. 569:11–570:8, 601:3–10. After reviewing the trip itinerary, deposition transcripts that contained similar testimony, and medical information about TBE, the Munns' expert, Rose, testified that in his medical opinion, Munn contracted the disease on Mount Panshan. Trial Tr. 698:6–699:5. According to Hotchkiss, all this evidence is insufficient, and Munn must come forth with a piece of evidence that proves conclusively that she contracted TBE on Mount Panshan.

■ That argument is almost certainly waived. A party may only assert a renewed claim for judgment as a matter of law under Rule 50(b) if it previously raised that specific issue during trial in a Rule 50(a) motion. *Lore v. City of Syracuse,* 670 F.3d 127, 152–53 (2d Cir.2012) ("A Rule 50(a) motion requesting judgment as a matter of law on one ground but omitting another is insufficient to preserve a JMOL argument based on the latter."); *see also Rand–Whitney Containerboard Ltd. P'ship v. Town of Montville,* 289 F.Supp.2d 62, 67 (D.Conn.2003) (requiring

an argument be "specifically raised" in a Rule 50(a) motion to preserve the issue for a Rule 50(b) renewed motion for judgment as a matter of law). Rule 50(a) requires that a party "must specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R.Civ.P. 50(a)(2). This "specificity requirement is obligatory." *Holmes v. United States*, 85 F.3d 956, 962 (2d Cir.1996). The specificity requirement explicitly bars a defendant from relying on one targeted attack to make several related arguments that it failed to raise during its original Rule 50(a) motion. *Lore*, 670 F.3d at 152. The purpose of the requirement is to give the claimant a·fair " 'opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury.' " *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 367 (2d Cir.1988) (internal citations omitted).

Although Hotchkiss introduced an alternative theory during its case-in-chief—that Munn had contracted Powassan virus in New York, not TBE in China—it did not argue lack of evidence in its Rule 50(a) motion. *Compare* Trial Tr. 1200:17–1201:17 *with* Mot. Hr'g Tr. 3:2–4:5, 5:2–6:9, 7:5–8:22 (July 11, 2013). During its original Rule 50(a) motion, defense counsel raised two grounds for judgment as a matter of law. Hotchkiss argued that (1) Munn had not proven that "she would have done anything differently" if the school had warned her of the risk of contracting an insect-borne disease, Trial Tr. 1201:2–5; and (2) the Munns had not proven that the school could have foreseen Munn's injury. Trial Tr. 1201:6–17. Hotchkiss never mentioned Mount Panshan, causation, Munn's infection by a tick, or any alternative theory of the source of Munn's disease in its motion.[12] Trial Tr. 1201:2–17. Hotchkiss now attempts to shoehorn its argument on causation into its Rule 50 motions after the fact, arguing that in referring to its belief that Munn would not have changed her behavior if issued a warning, it was in fact arguing causation. Hotchkiss argues that "everyone knew" it intended to refer to duty, foreseeability, and causation in its original motion and that its oblique references to what it believed Munn would do in response to advice were sufficient to·preserve all its causation theories and arguments. Mot. Hr'g Tr. 5:2–6:9, 8:10–22 (July 11, 2013).[13] This argument is at odds with the record, and as such, it is unpersuasive.

At the close of the Munns' affirmative case, their counsel believed that he had proven that Munn would have taken basic precautions against insect-borne diseases had she received sufficient warnings, she had been infected with TBE on Mount Panshan, and she had not contracted TBE, or a similar virus, prior to the China trip.[14]

**12.** Hotchkiss asserts that when I granted the Munns' pretrial motion to exclude Hotchkiss's "unpasteurized milk" theory as overly speculative and more prejudicial than probative, by process of elimination, the Munns' counsel should have known that Hotchkiss's Rule 50(a) motion raised the issue of causation, and specifically, infection on Mount Panshan. Reading the transcript of the Rule 50(a) motion in context, it is difficult to reach such a conclusion.

**13.** It should also be noted that Hotchkiss's allegation that Munn would not have taken precautions against insect-borne diseases if she had received appropriate advice on the issue is purely speculative. Hotchkiss introduced no evidence to substantiate that theory, and the record contradicts its assertion. Trial Tr. 1009:2–1010:2, 1010:15–1011:3.

**14.** At the hearing on post-trial motions, Hotchkiss's counsel asserted that the Munns' counsel must have known that Hotchkiss's motion challenged the sufficiency of the evidence of Munn's infection on Mount Panshan because that was Hotchkiss's only theory attacking causation. That characterization is

After Hotchkiss's Rule 50(a) motion, the Munns' counsel only had reason to worry about one of these three issues—whether appropriate warnings would have changed Munn's conduct. Hotchkiss's counsel did not raise the issue whether Munn contracted TBE during her hike on Mount Panshan during her Rule 50(a) motion, and its counsel cannot fairly make that argument now.

Even if Hotchkiss had preserved its argument that Munn did not contract TBE on Mount Panshan, the record in this case militates against that suggestion. Connecticut requires plaintiffs to demonstrate that two elements exist in order to meet the standard for legal causation: cause in fact and proximate cause. To test for cause in fact, the jury is asked if the injury would have occurred but for the defendant's conduct. *Paige*, 250 Conn. at 25, 734 A.2d 85. The test for proximate cause is "whether the defendant's conduct is a substantial factor in bringing about the plaintiff's injuries." *Id.* (citing *Nelson v. Steffens*, 170 Conn. 356, 363, 365 A.2d 1174 (1976)). Further, the plaintiff bears the burden of proving "an unbroken sequence of events that tied his injuries to the defendant's conduct." *Boehm v. Kish*, 201 Conn. 385, 392, 517 A.2d 624 (1986); *see also* Prosser & Keeton, *On Torts* § 41.

The Munns introduced a powerful circumstantial case sufficient to allow a reasonable jury to find in their favor. Both parties' expert witnesses testified that subtracting TBE's incubation period from the date of the onset of Munn's symptoms places her infection date near the day she visited the mountain. Trial Tr. 698:6–699:5, 1259:19–23. Munn testified that had Hotchkiss warned her of the risks of insect-borne diseases, she would have taken precautions to prevent infection. Trial Tr. 1009:2–1010:2, 1010:15–1011:3. Both sides presented evidence that Hotchkiss's conduct was a substantial factor in bringing about Munn's injuries. Mount Panshan's topography is consistent with ticks' natural habitat. Def.'s Trial Ex. 591, at 8. During Munn's hike, she received several bug bites, including one that looked different than a typical mosquito bite. Trial Tr. 1008:19–22, 1036:4–10. Neither Munn nor Yu remembered any other time that students or chaperones complained of insect bites, except for one night at an urban university when trip participants encountered mosquitoes at dusk. Trial Tr. 569:11–570:8, 601:3–10, 1008:23–1009:1. There was no evidence that an intervening event broke the chain of causation between the time Munn hiked Mount Panshan and when she became symptomatic, and Hotchkiss did not introduce evidence of an intervening event or potential alternative source of Munn's infection. It is true that Munn never testified she found a tick on her person on the day of her hike, carefully picked it off, and had it tested for TBE. Trial Tr. 1036:15–18, 1037:2–4. But the Munns are not required to produce evidence beyond a reasonable doubt that Munn contracted TBE on Mount Panshan; to meet their burden of proof by a preponderance of the evidence they may build their case on a set of reasonable inferences based on the evi-

inaccurate. Beginning after the Munns' rested and until the last day of evidence, Hotchkiss argued that Munn could have been infected before her trip with the Powassan virus, a disease with a similar genetic structure to TBE. Trial Tr. 1279:18–1280:11, 1526:10–25. Indeed, I declined to rule on the Munns' motion in limine to preclude evidence of Po-

wassan (doc. 179) because defense counsel asserted that she intended to call witnesses who would testify about Munn's potential exposure to the virus. Hotchkiss's counsel never called those witnesses, but the theory hung in the air well after the Munns rested, including during the school's summation. Trial Tr. 1526:10–25.

dence. *See Paige,* 250 Conn. at 34, 734 A.2d 85 ("Drawing logical deductions and making reasonable inferences from facts in evidence, whether that evidence be oral or circumstantial, is a recognized and proper procedure....") (citing *Latham v. Hankey,* 117 Conn. 5, 10–11, 166 A. 400 (1933)); *Vetre v. Keene,* 181 Conn. 136, 140–41, 434 A.2d 327 (1980); *O'Brien v. Cordova,* 171 Conn. 303, 305–06, 370 A.2d 933 (1976).

Hotchkiss argues that the Connecticut Supreme Court's precedent requires that Munn proffer direct evidence that she contracted TBE on Mount Panshan. Mot. Hr'g Tr. 4:1–5 (July 11, 2013). Hotchkiss relies on *Paige v. St. Andrew's Roman Catholic Church,* 250 Conn. 14, 734 A.2d 85 (1999), to support its position. In *Paige,* the Court reversed a jury award because the plaintiff could not prove that the defendant or its employees were the direct cause of the accident that injured him. *Id.* at 34, 734 A.2d 85. A contractor suffered gruesome burns when someone turned on a boiler that he was repairing, after he had been notified that all boilers had been turned off. *Id* at 21, 734 A.2d 85. The plaintiff, however, could never identify the person who flipped the switch, and the Court held that the jury could not assume that one of defendant's employees made the mistake when other people were also in the building. *Id.* at 34, 734 A.2d 85. The plaintiff's inability to demonstrate that the defendant or its employees flipped the switch, combined with the presence of third parties who might have done so, weighed against a finding of cause in fact or proximate cause.

The Court reached that conclusion not because plaintiff relied on circumstantial evidence but because the jury returned two contradictory findings, that "the defendant was negligent in failing to *supervise its employees, servants and agents,* and in failing to *instruct them* to refrain from activating the boiler," and that "the defendant was not negligent in failing to control access to these controls, or in failing to ensure that boiler number one's burner remained inoperable while the plaintiff was cleaning the boiler." *Id.* at 28, 734 A.2d 85 (emphasis in original). Because these two findings were in tension—the defendant was negligent in its supervision, instruction, and training, but the plaintiff could not show that one of the defendant's agents or employees turned on the boiler, the Court concluded that the jury had never clearly found that one of defendant's agents or employees ignited the boiler. *Id.* at 34, 734 A.2d 85. Without this link, the plaintiff could not show that "but for" the defendant's conduct, he would not have been injured, and as a result, he could not show that the defendant's actions were a substantial factor in bringing about his injuries.

In contrast to *Paige,* the jury here returned an unambiguous verdict. It found that Hotchkiss was negligent in its pre-trip planning and in its supervision of students during the trip. It also found that one or both of those negligent acts directly caused Munn's injury. Jury Verdict 1. Hotchkiss could not show that a third party was potentially responsible for Munn's injuries, nor could it show that Munn would have been infected even if Hotchkiss had advised her and provided appropriate insect repellent. Though the Munns cannot produce the tick that bit Cara Munn, they have put forth an unbroken string of facts that connect Munn's illness to a bug bite she received on Mount Panshan. The jury was reasonable in finding that is what happened.

### 4. *Contributory Negligence*

Hotchkiss argues that it should have been allowed to offer evidence of Mr. and Mrs. Munns' contributory negligence

at trial.[15] Hotchkiss posits three different theories regarding Mr. and Mrs. Munns' role in this case. The first theory is an assertion of the affirmative defense of assumption of risk dressed in the language of third-party negligence. Hotchkiss attempts to describe its argument as a theory of independent, third-party liability by arguing that Mr. and Mrs. Munn waived liability for Munn's injuries by signing the school's release and waiver, thus assuming all risks of international travel on their daughter's behalf. The second theory is that Hotchkiss discharged its duty to Munn by providing information about the risks in China to her parents. If those warnings were accurate and complete, then the school may have avoided liability. That is not a theory of parental fault; it is a theory of the school's absence of liability. The third theory is that Mr. and Mrs. Munn had an independent duty to protect their child from harm and that by allowing their daughter to travel to China on a school-organized and school-supervised educational trip, Mr. and Mrs. Munn committed an act of negligence. This argument is a theory of parental comparative negligence. It asserts that even if a school provided no warnings and took no action to minimize risk, parents would have an obligation to independently investigate threats to their child's health, and their failure to make an independent investigation could be used as evidence that those parents caused their child's injuries. Hotchkiss further asserts that the act of allowing a student to participate in a school trip is itself an act of parental negligence. Each theory fails.

## a. Affirmative Defense: Assumption of Risk

■ Hotchkiss waived its assumption of risk theory during the course of litigation: it did not raise this defense in its pretrial motions or at trial, it did not provide evidence in support of its affirmative defense, and it did not raise the issue in its Rule 50(a) motion. Pretrial Conf. Tr. 20:25–22:15 (arguing parental permission to participate in the trip was a negligent act that waived Munn's negligence claim against Hotchkiss); Trial Tr. 946:21–24, 958:23–959:6 (same). It is well-established that the party asserting an affirmative defense bears the burden of establishing that affirmative defense and its applicability by a preponderance of the evidence. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 439–40, 130 S.Ct. 1431, 176 L.Ed.2d 311 (2010) (state law controls the burden of proof required to adequately raise affirmative defenses in diversity cases) (citing *Palmer v. Hoffman*, 318 U.S. 109, 117, 63 S.Ct. 477, 87 L.Ed. 645 (1943)); *Juchniewicz*, 281 Conn. at 39, 914 A.2d 511 (party asserting affirmative defense of comparative negligence bears burden of proof for that defense pursuant to Conn. Gen.Stat. § 52–114); *Kakluskas v. Somers Motor Lines, Inc.*, 134 Conn. 35, 41, 54 A.2d 592 (1947) (citing *Freedman v. Hurwitz*, 116 Conn. 283, 289, 164 A. 647 (1933)) ("assumption of risk is an affirmative defense and the burden of proof [is] upon the defendant to prove it"); 1 E. Stephenson, *Connecticut Civil Procedure* § 83(e) (3d ed.1997).

Even if Hotchkiss had attempted to introduce evidence of assumption of risk,

---

**15.** Although Hotchkiss refers to contributory negligence (an absolute bar to negligence liability), and although Connecticut's General Statutes use the term "contributory negligence," *see* Conn. Gen.Stat. § 52–572h(b), it is important to note that Connecticut tort law is governed by the doctrine of comparative negligence. *Juchniewicz v. Bridgeport Hosp.*, 281 Conn. 29, 32 n. 4, 914 A.2d 511 (2009). I use the phrase "comparative negligence" to refer to Connecticut's regime.

which it did not, Connecticut law abolished the doctrine of assumption of risk when the state adopted its comparative negligence regime in 1973. Conn. Gen.Stat. § 52–572h(*l*) ("The legal doctrines of last clear chance and assumption of risk to which this section is applicable are abolished."); *Wendland v. Ridgefield Constr. Servs., Inc.,* 190 Conn. 791, 797, 462 A.2d 1043 (1983); *Gomeau v. Forrest,* 176 Conn. 523, 525–26, 409 A.2d 1006 (1979); *Sabella v. Fritz,* No. CV116007373S, 2012 WL 1870979, at *2 (Conn.Super. May 2, 2012) (barring assumption of risk claims "couched in negligence language"); *Cahill v. Carella,* 43 Conn.Supp. 168, 173, 648 A.2d 169 (Conn.Super.1994) (doctrine of assumption of risk abolished); *see also Eichelberg v. Nat'l R.R. Passenger Corp.,* 57 F.3d 1179, 1188 (2d Cir.1995) (recognizing Connecticut General Statute § 52–572h(*l*) and state case law had eliminated doctrine of assumption of risk). To date, the Connecticut Supreme Court has not allowed parties to contract into an assumption of risk.

■■■ Hotchkiss's attempt to analogize parental permission for participation in sports to a parental assumption of risk for a school's negligent conduct before and during a school-organized and school-supervised trip is inapposite. Moreover, this analogy ignores the stark asymmetry of information regarding the trip's details between the school, its students, and parents of Hotchkiss students. Hotchkiss knew the trip details, including specifics about where trip participants would visit, but it revealed only a handful of those details to its students and their parents. It is this partial revelation of trip information that forms the basis for the school's negligence liability. *See Reardon v. Windswept Farm, LLC,* 280 Conn. 153, 161–62, 905 A.2d 1156 (2006) (public policy bars releasing a defendant, with greater information

concerning potential risks/damages, from liability for the defendant's own negligence); *Hanks v. Powder Ridge Rest. Corp.,* 276 Conn. 314, 331, 885 A.2d 734 (2005) (waiver invalidated where plaintiff "lacked the knowledge, experience and authority to discern whether ... defendants' [facilities and equipment] maintained in reasonably safe condition."). Even if Hotchkiss had revealed all that it knew to parents, however, under Connecticut law, parents cannot waive the risks of participation in school activities on behalf of their minor children when a child's injury is the result of the defendant's negligence, or when the injury exceeds ten thousand dollars. *Hyson v. White Water Mtn. Resorts of Conn., Inc.,* 265 Conn. 636, 643, 829 A.2d 827 (2003) (parents cannot waive liability caused by defendant's own negligence); *Hanks,* 276 Conn. at 322, 885 A.2d 734 (same); *Lewis v. Habitat for Humanity,* 53 Conn.L.Rptr. 512, 2012 WL 386391 (Conn.Super.2012); *Fedor v. Mauwehu Council, Boy Scouts of Amer., Inc.,* 21 Conn.Supp. 38, 40–41, 143 A.2d 466 (1958) (same on public policy grounds); Conn. Gen.Stat. § 45a–631(b) (parents cannot waive liability for child when child's injury exceeds ten thousand dollars); Conn. Gen. Stat. § 52–572h(c) (abolishing doctrine of assumption of risk).

b. Providing Identical Warnings

■■■ Hotchkiss next argues that its warnings were complete and that by providing information regarding the trip to Mr. and Mrs. Munn, the school discharged its duty of care. Although Hotchkiss frames this as an issue of "contributory negligence," its argument turns on whether its own conduct was negligent.

Hotchkiss abandoned its theory of parental contributory negligence at trial and failed to preserve this argument in its original Rule 50(a) motion. Trial Tr.

959:13–960:4, 1201:2–17; *see* Fed.R.Evid. 103(a)(2); *Fortunato v. Ford Motor Co.,* 464 F.2d 962, 967 (2d Cir.1972) (proffer required where "the significance of the excluded evidence is not obvious"); *Ramsay v. Camrac, Inc.,* 96 Conn.App. 190, 206, 899 A.2d 727, *cert. denied,* 280 Conn. 910, 908 A.2d 538 (2006) (defendant must plead comparative negligence as an affirmative defense and bears the burden of proof on that issue); *Bradford v. Herzig,* 33 Conn.App. 714, 721, 638 A.2d 608, *cert. denied,* 229 Conn. 920, 642 A.2d 1212 (1994) (same). Counsel stated that she hoped to show that

> the parents . . . were fully advised of the itinerary of the trip, that they were provided information about visiting the CDC and—the CDC website, the state department website; that they received several packets of information about the trip; that they talked with Cara about the trip; that they signed the paperwork necessary for her to go on the trip; that they communicated with physicians on behalf of Cara in connection with the trip; . . . [and] that Mrs. Munn was involved in the planning for the trip, coordinated the trip, that the student was asked to consult with her parents about the trip. And I think that's it.

*Compare* Trial Tr. 959:13–960:4 *with* Def.'s Answer 4 (doc. 82) ("Plaintiffs' injuries were caused by their own contributory negligence, in that they failed to properly pack and prepare Cara Munn for her trip to China. . . ."). Defense counsel never suggested that she needed to question the parents about their knowledge of the China trip because Mr. and Mrs. Munn had negligently supervised Munn's preparation for it. Defense counsel claimed that the purpose of her line of questioning was to show that the school discharged its duty and adequately warned Munn by submitting identical travel materials to Munn and her parents. Trial Tr. 944:2–948:6, 950:6–956:25, 957:21–25. This line of defense was not based on a theory of parental negligence, but rather, a theory of the school's absence of liability.

I allowed the school to make that argument. The jury instructions stated that "Hotchkiss may argue that it discharged its duty to Cara in part by informing her parents about the trip; that is a factual issue for you to decide." Jury Instructions 11. I admitted any exhibits that contained information the parents received about the trip. Pls.' Trial Exs. 2, 10; Def.'s Trial Exs. 503, 504, 506, 507. I only excluded a narrow swath of the evidence: I did not allow the school to ask Mr. and Mrs. Munn how they reacted to the school's warnings because those inquiries would be more prejudicial than probative and would abrogate Connecticut's doctrine of parental immunity.

As Hotchkiss admitted, Mr. and Mrs. Munn received the same information as their daughter, either because they were copied on emails to students about the trip or because Munn was asked to give her parents copies of packets and forms. Trial Tr. 944:10–15. To prove its case, Hotchkiss did not need to question Mr. and Mrs. Munn about any additional information they uncovered with respect to the trip or about their impressions of the school's packets. If Hotchkiss gave parents sufficient warnings about the risks of the trip, then it arguably discharged its duty regardless whether Mr. and Mrs. Munn took the warnings to heart or ignored them entirely.[16] Moreover, any comments regarding the Munns' impressions of the

**16.** Put differently, if the school gave children and parents a perfect warning, it would have arguably discharged its duty because that information was sufficient to alert participants of risk, regardless whether those parents heeded the advice or ignored it.

school's information could have unfairly prejudiced the Munns' case by inappropriately casting a shadow of blame over Mr. and Mrs. Munn for not independently pressing their daughter to take precautions beyond what the school advised. That shadow would fall within Hotchkiss's third theory of liability: that Mr. and Mrs. Munn had an independent duty to conduct research beyond the information Hotchkiss provided and to warn Munn of additional health risks.

c. Parental Comparative Negligence

Hotchkiss next argues that (1) Mr. and Mrs. Munn negligently supervised their daughter's packing and preparation for the trip, thus triggering the release of liability clause in Hotchkiss's "Agreement, Waiver, and Release from Liability" ·("Release"), and (2) their decision to allow their minor daughter to travel to China with the school and under the school's supervision constituted an act of negligence that should either be imputed to Munn as comparative negligence or should break the chain of proximate causation. Neither argument is persuasive, and both arguments are barred by Connecticut law.

i. Parents' Alleged Negligent Supervision

■■■■■ Connecticut's doctrine of parental immunity bars an unemancipated minor from suing her parent for injuries inflicted during the child's minority and caused by that parent. *Ascuitto v. Farricielli*, 244 Conn. 692, 697, 711 A.2d 708 (1998); *Squeglia v. Squeglia*, 234 Conn. 259, 269–70, 661 A.2d 1007 (1995); *Dubay v. Irish*, 207 Conn. 518, 523, 542 A.2d 711 (1988); *Dzenutis v. Dzenutis*, 200 Conn. 290, 293, 512 A.2d 130 (1986); *Mesite v. Kirchenstein*, 109 Conn. 77, 82–83, 145 A. 753 (1929). The doctrine is not limited to negligence liability and extends to all torts in which a minor child suffers personal injuries. *Mesite*, 109 Conn. at 84, 145 A. 753. It also bars defendants from impleading parents as third-party defendants, attempting to apportion negligence liability, and advancing claims or counterclaims regarding parents' alleged comparative negligence. *Crotta v. Home Depot, Inc.*, 249 Conn. 634, 644–45, 732 A.2d 767 (1999).[17]

In *Crotta*, the defendant sought to join the minor plaintiff's father as a third-party

---

**17.** Since the Connecticut Supreme Court's ruling in *Crotta*,· numerous Connecticut trial courts have held that the parental immunity doctrine bars all parties from attempting to impute any parental negligence to a minor child and from attempting to impose liability for parental comparative negligence, assumption of risk and waiver, or apportionment. *Rumm v. The Shack Rest.*, No. CV106005077, 51 Conn. L. Rptr. 608, 611–12, 2011 WL 1468361 (Conn.Super. Mar. 25, 2011) (under *Crotta*, parent's negligence cannot be imputed to minor child); *Kochian v. Central Conn. Coast YMCA*, No. CV075011527S, 45 Conn. L. Rptr. 351, 355–57, 2008 WL 1735587 (Conn.Super. Mar. 31, 2008) (barring defendants from alleging parental comparative negligence in an effort to diminish minor plaintiff's recovery); *Littlejohn v. Barillaro*, No. NNICV054004211S, 42 Conn. L. Rptr. 808, 811, 2007 WL 586802 (Conn.Super. Jan. 29, 2007) (doctrine of parental immunity bars

all persons from bringing negligence claims against the parent); *Fuentes v. Mack*, No. CV030826133S, 36 Conn. L. Rptr. 777, 777, 2004 WL 886327 (Conn.Super. Apr. 1, 2004) (because parents are immune from liability, they cannot be made apportionment defendants); *Lyons v. Morrocco*, No. CV020515601S, 36 Conn. L. Rptr. 616, 619–22, 2004 WL 573849 (Feb. 2, 2004) (striking defendant's special defense of parental negligence in personal injury· case); *Kuzoian v. Saybrook Country Barn, Inc.*, No. CV000501052S, 2001 WL 134621, at *3–4 (Conn.Super. Jan. 22, 2001) (parental immunity doctrine precludes defense that parent assumed risk on behalf of minor child and additionally bars imputing parental negligence to minor child); *Wright v. Rogers*, No. 417078, 1999 WL 619582 (Conn.Super. Aug. 4, 1999) (barring defendant from asserting parental negligence as a special defense).

defendant in order to prove that the father's "negligent supervision" of his son caused his child's injuries. 249 Conn. at 636–37, 732 A.2d 767. Upon certification of the question from the U.S. District Court for the District of Connecticut, the Connecticut ·Supreme Court examined whether "the doctrine of parental immunity operat[ed] to preclude the parent of a minor plaintiff from being joined as a third party defendant for the purposes of: (1) apportionment liability; (2) contribution; or (3) indemnification based on the parent's allegedly negligent supervision of the minor plaintiff." *Id.* at 635, 732 A.2d 767. The Court concluded that all three actions were barred. *Id.* As the Court explained, "[a]llowing a cause of action for negligent supervision would enable others, ignorant of a case's peculiar familial distinctions and bereft of any standards, to second-guess a parent's management of family affairs." *Id.* at 643, 732 A.2d 767 (internal citations and quotation marks omitted). The Court further explained that allowing a party to implead parents as third-party defendants or to apportion liability to parents for their alleged comparative negligence would contravene the doctrine of parental immunity and allow the defendants "to accomplish indirectly that which could not be accomplished directly." *Id.* at 644, 732 A.2d 767.

Hotchkiss asserts that in signing its Release, Mr. and Mrs. Munn assumed the risk of travel to China on Munn's behalf and waived liability for Munn's injuries. Def.'s Mem. in Supp. of Combined Mots. 47–48; Pretrial Conf. Tr. 18:1–23; Trial Tr. 16:18–20:24; Pls.' Mot. in Limine, Ex. C (doc. 143). Although the language of the "Release of Claims" section is broad, it contains a significant exception: the agreement waived the school's liability "except to the extent that the liability, damage, injury, loss, accident, or illness is caused by the sole negligence or willful misconduct of the School, its officers, trustees, faculty, employees, agents, or representatives." Pls.' Mot. in Limine, Ex. C, at 3. Hotchkiss argues that it should have been able to introduce evidence of the Munns' alleged negligent supervision of Munn's preparation for her trip to prove that the school was not solely negligent.

Hotchkiss asserts that it should have been allowed to introduce evidence of how Mr. and Mrs. Munn's "actions or inactions . . . constituted the negligence responsible for [Munn's] injuries." Def.'s Mem. in Supp. of Combined Mots. 58. In the same breath, the school claims this is not an argument of comparative negligence, but rather, an argument that as third parties the Munns were negligent in allowing their daughter to travel to China through a school-organized and school-supervised summer educational program. *Id.*

A characterization of Mr. and Mrs. Munns' actions as "independently negligent" is not substantiated by the record.[18]

18. Hotchkiss argues that the parental immunity bar does not apply when parents bring a claim independent from their child's negligence action, and it argues that Mr. and Mrs. Munn's claim against the school is an independent claim. Def.'s Mem. in Supp. of Combined Mots. 62–63 (citing *Dzenutis v. Dzenutis*, 200 Conn. 290, 512 A.2d 130 (1986)). This is a mischaracterization of Mr. and Mrs. Munns' role in the litigation. As Hotchkiss stipulated, Mr. and Mrs. Munns' claims depend on the success of Munn's negligence claim and are thus properly categorized as dependent, not independent, claims. Charge Conf. Tr. 1437:12–1439:15 (stipulating that Mr. and Mrs. Munns' claim is a dependent claim, akin to reimbursing an insurance provider's costs). Hotchkiss relies on *Krause v. Almor Homes, Inc.*, 147 Conn. 333, 160 A.2d 753 (1960), for its position. In *Krause*, a parent brought two claims against the defendant: one for her minor child's injuries, allegedly caused by the defendant's negligence, and a second claim to cover the parent's costs related to treating the child's injuries. *Id.* at 333–34, 160 A.2d 753. On appeal, the Con-

Pretrial Conf. Tr. 20:25–21:7. Instead of offering evidence to develop an alternate theory for Munn's injuries, Hotchkiss doggedly focused on whether Mr. and Mrs. Munn independently researched the risks of travel to China and reviewed information provided by the school with their daughter. Trial Tr. 942:18–960:4. When asked to explain if Hotchkiss had reason to believe that Mr. and Mrs. Munn received any additional information beyond what the school provided to Munn, defense counsel admitted that it did not. Trial Tr. 959:13–960:4.

Like its "unpasteurized milk" theory, Hotchkiss's parental negligence theory was purely speculative. The school offered no evidence, beyond a request to cross-examine Mr. and Mrs. Munn regarding their own actions with respect to the trip, to substantiate its theory. Perhaps most importantly, although Hotchkiss never pleaded that Munn's negligence contributed to her injuries in its Answer, the school was allowed to introduce evidence of Munn's comparative negligence and to question Munn about her own actions in preparation for and during the China trip.[19]

It defies logic for Connecticut's parental immunity doctrine to bar claims between parties regarding tort liability but allow a party to assert parental negligence for the purposes of triggering a waiver provision to release tort liability. *See Littlejohn*, 42 Conn. L. Rptr. at 811–12 ("the special defense contends that the defendant is not liable, as a matter of law, because the parent's negligent supervision of her child in this case erects a legal shield ... the court finds the very reasoning upon which the parental immunity doctrine is founded militates against permitting the notion of parental negligence to be used as an independent special defense."). Connecticut courts have been loathe to diminish or bar a child's recovery for injuries caused by a

necticut Supreme Court considered the number of peremptory challenges afforded to each plaintiff in a jury trial where a parent has brought the first action in the name of the child and has brought a second, dependent claim for that parent's costs of treating the injured child. *Id.* at 334, 160 A.2d 753. The Court held that in such cases, the parent and child should be considered distinct parties for the purposes of exercising peremptory challenges. *Id.* at 335, 160 A.2d 753.

The distinction between *parties* in the context of Connecticut's liberal peremptory challenge regime does not change the dependence or independence of a parent's *claim*. *Kalams v. Giacchetto*, 268 Conn. 244, 261, 842 A.2d 1100 (2004); *Marshall v. Hartford Hosp.*, 65 Conn.App. 738, 750–51, 783 A.2d 1085 (2001), *cert. denied*, 258 Conn. 938, 786 A.2d 425 (2001). The Connecticut Supreme Court has held that regardless of how a trial court determines the proper allocation of peremptory challenges across parties to a lawsuit, a parent's claim to recover the cost of her child's treatment for injuries sustained by a defendant's negligence depends on the success of the child's negligence claim and cannot be brought independently. *Ooms v.*

*Ooms*, 164 Conn. 48, 52, 316 A.2d 783 (1972); *Krause*, 147 Conn. at 335, 160 A.2d 753; *Tulin v. Tulin*, 124 Conn. 518, 522, 200 A. 819 (1938); *Shiels v. Audette*, 119 Conn. 75, 77, 174 A. 323 (1934). It has further held that recovery of the parent's costs of treating their child's injuries are more appropriately understood as recovery on behalf of the child, not the parent. *Crotta*, 249 Conn. at 644, 732 A.2d 767 ("It is artificial to separate the parent and the child as economic entities.... The reality of the family is that ... it is a single economic unit and recovery by a third party against the parent ultimately diminishes the value of the child's recovery."); *Carney v. Federal Express Corp.*, No. CV020467894, 2003 WL 1995621, at *5 (Conn.Super.2003); *Hart v. Torello*, No. CV 990421294S, 25 Conn. L. Rptr. 506, 508, 1999 WL 793944 (Conn.Super. Sept. 24, 1999).

19. Although Hotchkiss alluded that Munn was comparatively negligent for her own harms in its Rule 50(a) motion, it waived that defense by failing to plead it in its Answer. *Ramsay*, 96 Conn.App. at 206, 899 A.2d 727.

parent's negligence, noting that regardless whether parental negligence is raised as a special defense, counterclaim, or apportionment, "the effect is the same—it diminishes the child's recovery. Current law does not permit such diminution." *Hart v. Torello,* No. CV990421294, 25 Conn. L. Rptr. 506, 508, 1999 WL 793944 (Conn.Super. Sept. 24, 1999) (citing *Crotta*); *see also Bartlett v. First Union Corp.,* No. CV000272108S, 2000 WL 1682537, at *1 (Conn.Super. Oct. 11, 2000) (assertion of parental negligence as a defense, regardless of absence or presence of claim on behalf of parent, is barred); *Dennis v. Makhraz,* No. CV970342399, 22 Conn. L. Rptr. 201, 204–05, 1998 WL 236001 (Conn.Super. May 1, 1998) (parental negligence cannot be raised in any form to diminish child's recovery); *Tobin v. Conn. Hous. Fin. Auth.,* No. LPLCV92333231S, 1997 WL 345332, at *5–8 (Conn.Super. June 17, 1997) (defendant barred from arguing special defense that parents had duty to take independent and additional precautions to prevent threats to child's health); *Feer v. Santini,* No. CV 930531207S, 19 Conn. L. Rptr. 612, 612 (Conn.Super. June 13, 1997) (defendant cannot claim parental negligence to diminish the damages recoverable or to destroy proximate cause).

 Hotchkiss argues that it seeks to transfer or apportion blame to the Munns for their daughter's injury under a theory of parental negligence in order to lessen its own negligence liability. *Crotta* contemplated such arguments for apportionment and barred attempts to recover from, or to consider in the determination of negligence liability, the allegedly negligent conduct of parties against whom there could be no tort liability. *Crotta,* 249 Conn. at 639, 644, 732 A.2d 767; *see also* Conn. Gen.Stat. § 52–572h(c). This bar additionally provides that parents cannot recover for injuries to their minor child caused by another's negligence; only the child can recover for her harm. *Crotta,* 249 Conn. at 640, 644–45, 732 A.2d 767. As noted above, parental conduct cannot be used to bar the negligence claim of a minor child, and thus Mr. and Mrs. Munns' alleged negligence is irrelevant to a determination of the Release's scope.

Hotchkiss's policy argument that the school should not pay for a parent's negligence misunderstands the posture of this case and is unavailing. Mr. and Mrs. Munn do not seek to recover damages independent of Munn's recovery. They originally appeared as "next friend" to their minor daughter, and when their daughter reached her majority, their claims remained as dependent claims seeking the economic damages incurred between the time Munn was injured and the filing of her lawsuit. Hotchkiss argues that it should at least have been able to submit the waiver to the jury, along with evidence of Mr. and Mrs. Munn's alleged negligence, so the jury could determine whether its release clause was applicable in this case.

As discussed in my Ruling on the Munns' motion in limine (doc. 177), introducing the waiver was likely to confuse the jury and would have proved more prejudicial than probative, particularly in light of Connecticut's policy disfavoring the enforcement of liability waivers that release a defendant from liability for its own negligence. *Hanks,* 276 Conn. at 321, 885 A.2d 734 ("law does not favor contract provisions which relieve a person for his own negligence ... antipathy to releasing [a] defendant from its own negligence has deep roots in Connecticut jurisprudence.") (internal citations omitted); *Hyson,* 265 Conn. at 643, 829 A.2d 827 (same); *Griffin v. Nationwide Moving & Storage Co., Inc.,* 187 Conn. 405, 413, 446 A.2d 799 (1982)

(same); *Fedor*, 21 Conn.Supp. at 39, 143 A.2d 466 (same principle applies in context of a minor injured at camp where parents signed waiver of liability); *Welch v. Boston & Albany R.R. Co.*, 41 Conn. 333, 337 (1874) (same). Further, because the interpretation, and thus applicability, of the waiver is a question of law, there is no harm or prejudice to the defendants in excluding submission of the waiver to the jury. *Viera v. Cohen*, 283 Conn. 412, 428–29, 927 A.2d 843 (2007) (releases/waivers are governed by the law of contracts); *Gould v. Mellick & Sexton*, 263 Conn. 140, 151, 819 A.2d 216 (2003) ("once a contract has been determined to be unambiguous, the proper interpretation and construction of the contract becomes a question of law"); *Tallmadge Bros., Inc. v. Iroquois Gas Transmission Sys., LP*, 252 Conn. 479, 495–96, 746 A.2d 1277 (2000) (same); *see generally* Order *granting in part and denying in part* Pls.' Mot. in Limine (Mar. 22, 2013) (doc. 177).

Because the school had no viable claim of parental comparative negligence and waived any comparative negligence claims against Munn and her parents, it suffered no prejudice by my exclusion of its waiver of liability.[20] The waiver preserved the school's liability for any "damage, injury, loss, accident, or illness [ ] caused by the sole negligence or willful misconduct of the School, its officers, trustees, faculty, employees, agents, or representatives." Pls.' Mot. in Limine, Ex. C, at 3. The jury found Munn was "0%" responsible for her injuries. Jury Verdict 2. The school did not, and properly could not, ask for an interrogatory regarding Mr. and Mrs. Munns' fault. The school failed to properly plead any other affirmative defense and did not submit any non-parental theories of comparative negligence. According to the jury, no one but the school could be liable for Munn's injuries. Thus, even if I had ruled that the school could enforce the waiver, it would not have affected the outcome in this case because the jury found the school was solely negligent.[21]

Even if Hotchkiss's characterization of its parental negligence theory were accurate, it would not fall within any recognized exception to the parental immunity doctrine. The Connecticut courts have

**20.** I allowed Hotchkiss to present parts of the packet containing the waiver to the jury, but I directed it to redact any legal language concerning liability. Any information about the risks of travel remained available to the jury.

**21.** Concerning the validity of the waiver, I stand by my earlier decision in this case. *See generally*, Ruling on Pls.' Mot. in Limine (doc. 177). I would only add two additional thoughts: First, study-abroad programs are not an inherently dangerous activity like skydiving. Hotchkiss could have taken simple steps to apprise itself of the risks of insect-borne disease and to protect students from those risks. This is not a case where the school lacked control. Second, as I stated before, a layperson cannot have understood that "solely negligent" meant what Hotchkiss argues it means. I note here the extreme character of Hotchkiss's argument: According to the school, if any outside cause contributed in any way to an accident, even if a jury found that person or force only one percent responsible, the school would be absolved of all responsibility. This position is violative of Connecticut's comparative negligence scheme and attempts to revive two abrogated doctrines—assumption of risk and contributory negligence—as complete bars to recovery. To use a hypothetical to illustrate the extremity of this position, if a school bus driver negligently sped down a hill and crashed a bus full of students, the school could avoid liability for students' injuries if the bus driver struck a car with a broken taillight. There is no tort regime in the country that holds plaintiffs to so high a bar, and no one would expect a school to escape liability in this way. The normal expectation would be to interpret "solely negligent" in the context of comparative fault—that the school was solely responsible, as compared to Munn, for the negligence that contributed to an injury.

construed parental negligence broadly, with exceptions only for a parent's negligent operation of a motor vehicle, aircraft, or waterborne vessel, Conn. Gen.Stat. § 52–572c; negligent conduct of a parent at a business enterprise located outside of the home, where the parent acts in a primarily nonparental capacity, *Dzenutis,* 200 Conn. 290, 512 A.2d 130; or a parent's sexual assault/exploitation of her child, where the parent's misconduct is so heinous that it destroys familial harmony, *Henderson v. Woolley,* 230 Conn. 472, 486, 644 A.2d 1303 (1994). *See also Squeglia,* 234 Conn. at 265, 661 A.2d 1007 (noting exceptions to parental immunity may only be made if they are appropriate under the circumstances and accord with public policy considerations). Further, in light of the public policy rationale underlying the parental immunity doctrine, it is inappropriate to apply the legal framework for negligence actions between adults with no familial relationship to the specific context of parent-child tort claims.[22]

█ *Crotta* did not reach the question that Hotchkiss claims was raised in this case: whether a defendant may ask for a jury interrogatory about parents' comparative negligence even if the parents cannot be held liable for their conduct and any parental negligence cannot be attributed to their child. Given the Connecticut Supreme Court's firm policy statement, it is difficult to imagine that a Connecticut state court would allow such a question to go to the jury. *Rumm,* 51 Conn. L. Rptr. at 611–12 (under *Crotta,* parents' negligence cannot be imputed to minor child); *Littlejohn,* 42 Conn. L. Rptr. at 811 (doctrine of parental immunity bars all persons

from bringing negligence claims against the parent); *Fuentes,* 36 Conn. L. Rptr. at 777 (if parents are immune from liability, they cannot be made apportionment defendants); *Kuzoian,* 2001 WL 134621, at *3–4 (parental immunity precludes defense that parent assumed risk on behalf of minor child and additionally bars imputing parental negligence to minor child). I conclude Hotchkiss had no right to such an interrogatory.

ii. Parental Permission to Participate in School–Organized, School–Sponsored, and School–Supervised Travel

If Hotchkiss indeed sought to argue that a parent's decision to allow her minor child to participate in a school-organized, school-sponsored, and school-supervised trip is itself an act of negligence, then that argument is ludicrous. Def.'s Mem. in Supp. of Combined Mots. 61 ("Consequently the jury was unable to consider whether the cause of the plaintiff's injury was the decision her parents made to let her travel to China."). Further, its suggestion that, as a matter of law, a school is released from liability every time a parent consents to her minor child participating in a school trip contravenes Connecticut law, public policy, and logic.

5. *Public Policy*

█ Hotchkiss next argues that, even if it had a duty to warn Munn of the risks of insect-borne diseases and advise her of precautions against contracting those illnesses, public policy should limit its liability. Under Connecticut law, even if a defendant could have foreseen a risk, the law excuses it from liability when "on

---

**22.** Hotchkiss cites *Archambault v. Soneco/N.E., Inc.,* 287 Conn. 20, 946 A.2d 839 (2008), one of Connecticut's only cases to hold an employer liable for injuries traditionally covered through workers' compensation, as justification for why it should be released from liability. The policy rationales underlying workers' compensation and parental immunity differ significantly and cannot be blindly transplanted from one regime to the other.

the basis of a public policy analysis . . . the defendant's responsibility for its negligent conduct [does not] extend to the particular consequences or particular plaintiff in the case." *RK Constructors,* 231 Conn. at 387, 650 A.2d 153. A public policy exception to liability depends upon four factors: "(1) the normal expectations of the participants in the activity under review; (2) the public policy of encouraging participation in the activity, while weighing the safety of the participants; (3) the avoidance of increased litigation; and (4) the decisions of other jurisdictions." *Monk,* 273 Conn. at 118, 869 A.2d 179 (internal citations and quotation marks omitted). Hotchkiss contends that Connecticut public policy disfavors imposing liability for an unprecedented illness contracted by a student on a foreign trip.

As a preliminary matter, Hotchkiss has likely waived this argument—it did not raise this issue in its Rule 50(a) motion at trial, thus waiving the argument upon renewal. *Compare* Trial Tr. 1200:17–1201:17 *with* Def.'s Mem. in Supp. of Combined Mots. 13–16; Mot. Hr'g Tr. 31:4–6 (July 11, 2013); *see also infra* section III.B (citing the Second Circuit's standards regarding the level of specificity required in Rule 50(a) motions to preserve those issues upon a Rule 50(b) renewed motion).

 To assess the reach of public policy, a court must consider "the *particular* consequences to the *particular* plaintiff in the case." *Id.* (emphasis added). In other words, a public policy analysis is a case-specific standard. Although public policy arguments are not resolved by juries, they require that the court understand what happened to a plaintiff, a question only answered after a judge has heard evidence detailing the circumstances that resulted in an injury. *See Lodge,* 246 Conn. at 578, 717 A.2d 215 (resolving public policy question after trial); *Jaworski,*

241 Conn. at 408, 696 A.2d 332 (same). To address public policy for the first time at this stage in the litigation deprives the Munns of the opportunity to rebut Hotchkiss's version of events. How, for example, could the Munns have known that they needed to offer evidence of "the normal expectations of the participants in the activity under review"? Even if Hotchkiss had adequately preserved its argument, however, it should not be excused from liability on the basis of public policy.

 Hotchkiss has recast its arguments regarding foreseeability as an issue of public policy. The two concepts are distinct and should be evaluated separately. *Jaworski,* 241 Conn. at 405, 696 A.2d 332 ("The final step . . . is to make a determination of 'the fundamental policy of the law' ") (citing Prosser & Keeton, *On Torts* § 43). Connecticut law requires courts to determine the existence of a duty by first evaluating whether a plaintiff's injury resulted from foreseeable risks. *Monk,* 273 Conn. at 114, 869 A.2d 179. If the court finds a foreseeable risk existed such that it fell within the scope of a defendant's duty to exercise reasonable care, then the court proceeds to a public policy analysis. *See, e.g., Jaworski,* 241 Conn. at 404, 412, 696 A.2d 332 (holding first that injuries sustained during contact sports were foreseeable, then deciding that public policy insulated the defendant from liability for those injuries); *RK Constructors,* 231 Conn. at 387, 650 A.2d 153 (holding first that tortfeasor could have foreseen that victim's employer's insurance premiums might increase, and then deciding that public policy precluded liability for those increases). There is no public policy exemption protecting defendants from liability for unforeseeable risks because there is no duty to protect against unforeseeable risks in the first place. The public policy backstop protects defendants from liability

in those extraordinary cases where a risk is foreseeable but still falls outside the realm of threats that society expects people to avoid. It does not provide defendants with a backdoor route to relitigate the issue whether a risk was foreseeable and thus, whether a party should have anticipated the risk or not.

This distinction is clear in the handful of cases in which the Connecticut Supreme Court has invoked a public policy exemption to negligence liability. In *Jaworski*, the Court vacated a jury award for a soccer player's injury because contact sports are inherently dangerous. 241 Conn. at 412, 696 A.2d 332. The Court reasoned, "when competitive sports are played, we expect that a participant's main objective is to be a winner, and we expect that the players will pursue that objective enthusiastically. We also anticipate that players in their enthusiasm will commit inadvertent rules violations from which injuries will result." *Id.* at 408, 696 A.2d 332. According to the *Jaworski* Court, negligence liability could not extend to youth who injured another youth during a game although injuries were a foreseeable outcome of healthy competition on the soccer field. *Id.* at 408–09, 696 A.2d 332 (the Court noted that it had preserved liability for intentional torts on the field when conduct was "deliberate, willful, or reckless," but that negligence liability would be inappropriate in this specific context). Similarly, in *Lodge*, the Court held that an alarm company could not pay the price for a city's negligent maintenance of its own fire trucks. 246 Conn. at 576–77, 717 A.2d 215 (although framed as a public policy rationale, it is important to note that the Court determined there was no proximate or factual causation in the case, and consequently, it declined to attach negligence liability). In *RK Constructors*, the Court did not allow an employer to sue over an increase in its insurance premiums following a negligent subcontractor's injury to the plaintiff's employee because the relationship between the plaintiff's harm (increased insurance premiums) and the defendant's conduct was too attenuated. 231 Conn. at 387–88, 650 A.2d 153. Although the Court cast its decision as based on public policy, its decisions in *Lodge* and *RK Constructors* are more properly understood as decisions regarding issues of attenuation and causation, not traditional public policy analyses.

In all three cases, the Connecticut Supreme Court used public policy to correct for situations where there may have been foreseeability, but where other elements of negligence were deficient or where a related tort principle disfavored liability—in *Jaworski*, a victim's participation in an activity requiring exposure to certain knowable risks; in *Lodge*, the conduct of a third party and an intervening cause; and in *RK Constructors*, the limit on benefits to third parties suffering indirect harm from a tortfeasor's conduct. Hotchkiss has not identified a similar principle, nor has it properly evaluated the four factors determinative of the public policy exception to liability.

 The issue here, then, is not whether Munn's injury was "unprecedented," as Hotchkiss argues, but instead whether Connecticut public policy disfavors imposing liability on schools that fail to warn students about, and protect students from, a foreseeable risk of insect-borne disease. Applying the four factors dictated by the Connecticut Supreme Court, there is no reason to believe that Connecticut would make such a choice.

First, the average participant in a boarding school's study-abroad program expects that the school will warn and protect her against known and knowable threats to her health and safety. Hotch-

kiss admits that it has embraced such a duty, and its representatives testified as to their perceived duties and obligations at trial, including their duty to warn students of health risks while traveling abroad on Hotchkiss's study-abroad programs. Trial Tr. 102:18–103:24, 123:18–125:5, 325:24–326:4; *see also supra* section III.A.1. Although international travel may pose health risks unlike those experienced domestically, Hotchkiss noted that the degree of medical risk was a factor in choosing its programs and that it would typically warn participants of those risks. Trial Tr. 144:5–16. Further, the school indicated that it would provide travel medicine advising and on-trip care, as well as noting when it believed certain precautions were essential or non-essential for participants in its China program. Pls.' Trial Ex. 1, at 9 ("the Hotchkiss infirmary can serve as a travel clinic"); Pls.' Trial Ex. 2, at 2 (same); Pls.' Trial Ex. 8 (Hotchkiss's medical travel advisory to students); Pls.' Trial Ex. 507, at 2 (advising parents of medical insurance considerations); Trial Tr. 113:11–114:13, 117:19–118:4, 976:22–977:7. Taken together, these representations could reasonably lead the average participant to believe that Hotchkiss would adequately warn and protect against health risks during the trip.

Second, though Connecticut public policy encourages international studies generally, Hotchkiss has not identified a single statute, regulation, court decision, or government program that prioritizes a student's exposure to new lands and experiences over her health and safety. Although the injury in this case occurred on foreign soil, the case is not about the benefits of foreign travel; it is about how much a boarding school, in conducting a school-sponsored trip and program, has to do to protect students from foreseeable medical risks. Here, the jury found that Hotchkiss knew or should have known of a category of diseases that could harm a student while on the school's China trip. The underlying public policy question is whether private boarding schools should be excused from a duty to warn and protect students from foreseeable insect-borne diseases when those schools expose students to unfamiliar environments.

Unlike soccer, where the risk of injury is inherent to playing the game, the risk of contracting an insect-borne disease is not inherent to foreign travel. Many students study abroad and, with proper advice and protection, are able to minimize the risk of contracting insect-borne diseases. Further, Hotchkiss cannot argue that insect-borne diseases are so inherent to travel to China that the school cannot take reasonable precautions to prevent injury from those diseases.[23] Just as youth soccer leagues require players to wear shin guards as a prophylactic against severe leg injuries, it is reasonable that a school require that students take precautions against insect-borne diseases in order to participate in a study-abroad program. It is possible both to expose students to the rich experience of foreign travel and to protect students' health.

Third, there is no reason to believe that holding the school liable in this case will increase litigation any more than doing so in any other case where a child's health is

**23.** Hotchkiss considered typhoid a serious disease requiring prophylaxis, and it required that students receive a vaccination before departing for China. *See* Pls.' Trial Ex. 2 (noting Munn's typhoid vaccination). Similarly, once the jury established that insect-borne illnesses are a foreseeable risk of travel in certain environments, it was reasonable for the jury to determine that a reasonable person, in Hotchkiss's position, would have attempted to mitigate the likelihood of infection.

at risk. People are usually sensitive about children becoming injured or hurt. Any case in which a child suffers ignites strong feelings, especially in parents. Whether this case creates a legal barrier to suit or not, parents and guardians will likely continue to sue parties who they believe exposed their children to danger that resulted in harm.

Last, it is not clear that any jurisdiction has decided a similar question. Hotchkiss cites a New York case in which the trial court held that there was no duty to protect a child during a field trip because the school could not have foreseen the injury he sustained. *David v. N.Y.C.*, 40 A.D.3d 572, 835 N.Y.S.2d 377, 379 (N.Y.Sup.Ct. 2007). Once again, that case involved an issue that is different from the question presented here—whether a school should be released from its duty to protect a student from a foreseeable risk. Hotchkiss also cites an Illinois decision in which the Court of Appeals declined to hold a school responsible for the risk that a twelve-year-old boy would be assaulted by an unaffiliated group of students during a field trip. *Mancha v. Field Museum of Nat. Hist.*, 5 Ill.App.3d 699, 283 N.E.2d 899 (1972). But *Mancha* is also inapposite because it turned on third-party liability. In sum, Hotchkiss has not and likely cannot point to a jurisdiction that insulates schools from liability for exposing their students to foreseeable and harmful diseases during a school-organized and school-supervised activity.

At closing argument, Hotchkiss presented a parade of horribles, warning that if Hotchkiss were required to pay for Munn's injuries in this case, schools across the country would shut down all extracurricular activities. Otherwise, "before the boy's [sic] soccer team gets off the bus, the coach would have to make sure they have insect repellent, insect[-]protective clothing in case the ball goes off the field, and they have to go into the woods to get it," and "[b]efore the eighth graders leave Grand Central Station in New York ... the chaperones would have to ensure bug protection in case [students] ran up against a bush in Central Park." Trial Tr. 1513:8–16.

The jury rejected that argument. I do, too, because compared to contracting a serious insect-borne disease, the burden upon schools appears minimal: schools would simply remind students to use bug spray and would bring bug spray on trips, the way school staff remind student athletes to put in their mouth guards before they take the football field or advise them to apply sunblock before walking outside on a sunny day.[24] This case is no different from other tort cases, and the imposition of liability will lead to three possible results: some schools may cancel programs, others will offer safer programs, and others will simply buy more insurance. Just as liability for design defects in automobiles has not emptied the nation's highways, this case will not put a stop to high school extracurricular activities.

---

**24.** The school assumes that if public policy allows the Munns to bring these claims, it could only avoid liability if it chose the most extreme prophylaxis. But that is not necessarily the case. Here, Hotchkiss made no attempt to warn students about insects or to protect students against insect-borne disease. This is not a case where the school provided students with simple, accurate advice about the risk of insect-borne disease and then a quick, gentle reminder to apply bug spray before hiking. The jury may well have found for the defendant had Hotchkiss taken those two precautions but not instructed its teachers to apply the spray onto students' skin or failed to insist that students wear long sleeves and long pants. Too much went wrong in the spring and summer of 2007 for this case to resolve the question of the minimum amount of care required for a school to discharge its duty to protect students from insect-borne disease on school trips abroad.

### B. *Expert Witnesses*

 Hotchkiss contends that I improperly admitted expert testimony from two of the Munns' witnesses and improperly excluded evidence from a defense witness. Decisions to admit and exclude expert testimony fall within this court's discretion. Under Federal Rule of Evidence 702, a district judge may admit expert testimony from anyone "who is qualified as an expert by knowledge, skill, experience, training, or education." Because expert testimony comes with a powerful imprimatur, district judges have a "gatekeeping responsibility" to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786. District judges remain largely in control of testing an expert's mettle; as the Supreme Court has instructed, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

### 1. *Peter Tarlow*

 After a colloquy establishing his qualifications, I accepted Tarlow as an expert in the tourism risk management industry and in the existing policies of government agencies and educational institutions regarding protection against insect-borne disease. Tarlow has worked in the area of tourism, risk management, and security for over twenty years. Trial Tr. 428:7–8. He has written books and scholarly articles about how to assess risks posed on trips abroad and how to mitigate those risks. Trial Tr. 428:22–429:4. He will soon be the head of study-abroad programs for the Texas A & M University system. Trial Tr. 429:12–18. Although he did not have any prior experience in China, he did not testify about the risks of travel in China—he assumed that the risk of insect-borne disease was foreseeable and then opined about the proper precautions schools should take to protect students.

Tarlow did not have any prior knowledge of a standard of care for secondary schools providing study-abroad programs, but as Hotchkiss admitted, it would have been hard for him to have known of one—in 2007, there was no published standard of care for such trips. Trial Tr. 210:25–211:2. Tarlow did what any expert would: he developed a hypothesis, researched the question and arrived at a sensible conclusion. Tarlow hypothesized that schools had a duty to warn students of insect-borne disease, advise them of precautions and mandate that students take those precautions. He tested this idea by looking at mandated safety standards for adults and assumed those standards would set the minimum level of precaution necessary to protect a minor. He found government documents and manuals from educational institutions, all published before the Hotchkiss trip, that outlined insect precautions for adults and assumed that those recommendations would be mandated for students.[25] This method was both common and commonsensical. In fact,

---

**25.** Hotchkiss criticizes Tarlow's approach in part because he used the internet to find source documents and connect with colleagues. This argument is thin. First, it does not matter what medium an expert uses to gather material; it matters whether those sources are reliable and relevant. Nor does it matter whether someone discussed a case with a colleague over the phone, as Freedman did, or brainstormed on a message board. Second, I find it amusing that someone might chafe at using the web to gather information in 2013.

Thompson conducted a similar analysis when he designed the pre-trip materials for Hotchkiss students. As Thompson testified at trial, he could not find any published standards for study-abroad programs that served high-school-aged students, so "[m]ost of the work I did was based on information that's available for university-level students." Trial Tr. 270:6–7. Thompson took those standards as a baseline and tweaked them to fit the needs of high-school students. Given that Tarlow took this reasonable approach, any issues with his research go to the weight, not admissibility, of his testimony, and concerns with his method were appropriate grounds for cross-examination, not exclusion.

Even if Tarlow lacked the expertise or used unsound methods to arrive at an opinion, any error was harmless. Hotchkiss's witnesses admitted that in other contexts they warn students of the risk of insect-borne disease, advise students about how to minimize those risks and at times insist that students take precautions in areas where the school knows of a risk. See, e.g., Trial Tr. 313:14–18 (Thompson acknowledging mandated precautions to prevent Lyme disease on campus), 327:8–18 (Thompson admitting that, where risk is known, school warns students about insect-borne disease and ensures students take precautions), 124:1–125:25 (McKenzie admitting that where school knows of insect-borne disease, it gives warnings about precautions and compels students to take precautions in a "very different way" than it did in Tianjin). Thus, even if I had excluded Tarlow's testimony, the jury would have heard defense witnesses announce the same standard of care that Tarlow articulated—that schools must warn students of foreseeable disease risks, inform students of appropriate precautions and require that students adopt those precautions in environments where they will encounter disease risks.

### 2. *Stuart Rose*

 I qualified Stuart Rose as an expert in travel medicine, including in the standards that apply to preparing for foreign travel and precautions taken during foreign travel. Hotchkiss does not dispute Rose's qualifications as a travel medicine expert, perhaps because it would be difficult to impugn his decades of experience. Rather, the school argues that Rose has too little experience with secondary schools to opine about the relevant standard of care for educators advising adolescents on travel risks.

Much like its argument on foreseeability, Hotchkiss hopes to prevail by narrowing the scope of evidence to an absurd degree. Rose did not have to be an experienced scholar of study-abroad programs with a sub-specialty in infectious diseases to render an expert opinion on what most reasonable trip planners would have done to protect minors from a medical risk while traveling abroad. He only had to have relevant knowledge, skill, training, experience or education to shed light on a question unfamiliar to the jury; in this case, what reasonable professionals should do to apprise themselves of medical risks, and, once aware of those risks, what they should do to minimize those risks. This inquiry requires some specialized knowledge—for example, in how to measure disease prevalence and severity, or how to choose among prophylaxes—but it did not demand that the expert possess a hyper-specific skill set that allowed him to resolve a technical problem. See Daubert, 509 U.S. at 589–90, 113 S.Ct. 2786 (outlining factors for qualifying expert testimony).

Given the limited complexity of the questions presented to Rose, he was more than qualified to opine about whether

Hotchkiss should have foreseen the risk of insect-borne disease and whether the school chose appropriate medical precautions to protect students from that risk. Rose has practiced travel medicine for decades, and he has published extensively in the field, including authoring many editions of a manual assessing medical risks abroad. Trial Tr. 618:6–619:18. At his travel medicine clinic in North Hampton, Massachusetts (a town surrounded by colleges), Rose routinely advises students in their teens and early twenties on how to prepare for health risks they may encounter abroad. Trial Tr. 620:23–621:7. Indeed, he testified that fifty percent or more of his patients are young people. Trial Tr. 628:11–16. Through his research, writing and experience, Rose has had occasion to study the steps organizations take when leading trips abroad for young people and to advise those organizations about what they should do to protect children. Trial Tr. 627:1–630:25.

The concerns Hotchkiss has raised go to the weight, not admissibility, of Rose's testimony. As *Daubert* explains, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786.

### 3. *William Fluharty*

Hotchkiss proffered William Fluharty as an expert in school study- and travel-abroad programs and offered his testimony about the standard of care followed by similarly-situated schools, including practices related to the prevention of insect-borne diseases. Trial Tr. 1277:8–13. Ac-

cording to his testimony, Fluharty had worked as the head of global studies at a boarding school in Virginia since 2001, and he had gained his expertise regarding international travel programs at private schools and their practices through his work with the organization that administered those surveys, the Global Education Benchmark Group ("GEBG"). Trial Tr. 1283:12–1285:18. The first survey was distributed to approximately forty schools in 2008, and the second to approximately eighty schools in 2012.[26] Trial Tr. 1324:8–14, 1325:9–15. Fluharty testified that he had reviewed the results of both surveys and that those surveys, in addition to his personal experience at his school, formed the basis from which he drew his conclusions and opinions. Trial Tr. 1283:12–1285:18. On that basis, I qualified Fluharty to give expert testimony. Trial Tr. 1287:6–12. Over the course of his testimony, however, it became clear that Fluharty did not base his opinion on survey results or on other reliable facts or data of a type reasonably relied upon by other experts in the field; instead, he gave unsupported, personal lay opinions disguised as industry standards. Accordingly, for the first time in over fourteen years on the bench, I struck testimony because it was false and misleading.

In order to achieve its central objective, Rule 702 requires district judges to serve as "gatekeepers" and admit only expert testimony that "rests on a reliable foundation and is relevant to the task is hand." *Daubert*, 509 U.S. at 594–95, 597, 113 S.Ct. 2786; *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir.2002); Fed.R.Evid. 702, 703. Expert

**26.** According to Fluharty's testimony, in 2012, 1400 independent schools were members of the National Association of Independent Schools ("NAIS"), and 250 of those schools had travel-abroad programs. Of those 250 schools with travel-abroad programs, GEBG surveyed approximately 40 schools in 2008 and 85 schools in 2012. Trial Tr. 1324:18–1325:6.

testimony must be relevant and empirically valid—i.e., reliable and truthful—to be admissible. Rule 702 establishes four factors for district judges to consider when determining whether to admit expert testimony: it must (1) offer scientific, technical, or specialized knowledge that will help the trier of fact determine a fact at issue; (2) be based on sufficient facts or data; (3) be the product of reliable principles and methods; and (4) have reliably derived from the application of those principles and methods to the facts of the case. Those factors are not exhaustive, however, and testimony may also be excluded or stricken if the expert unjustifiably extrapolates from an accepted premise to an unfounded conclusion (an analytic gap or attenuation between data and conclusion), *General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); if the expert fails to apply the same intellectual rigor in the courtroom as he would in the practice of his professional work, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); and if the expert's field of knowledge cannot be properly applied to the factual issue requiring determination, *id.* at 150–51, 119 S.Ct. 1167.

■ District judges are afforded flexibility to ensure expert testimony is both relevant and reliable. *Kumho Tire Co.*, 526 U.S. at 152, 119 S.Ct. 1167 ("the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."); *Amorgianos*, 303 F.3d at 265 (same). Further, the Second Circuit has noted that district judges "should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand" when determining whether to admit expert testimony. *Id.* at 267.

■ Expert testimony must also conform to other evidentiary rules; for example, expert opinions based on otherwise inadmissible hearsay may only be admitted if the facts or data are " 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.' " *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786 (citing Rule 703); *see also* Fed.R.Evid. 703 advisory committee's note (2000). In determining whether underlying facts or data are reliable, a district court's inquiry must focus on an expert's principles and methodology without regard to the conclusions the expert has reached or the "correctness" of the conclusions. *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786; *Amorgianos*, 303 F.3d at 265. But the Supreme Court has noted that "conclusions and methodology are not entirely distinct from one another" and "nothing in *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146, 118 S.Ct. 512. Accordingly, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 265, 267 (internal citation omitted). Thus, district judges must determine that proffered expert testimony is well-reasoned, not speculative, and properly grounded in an accepted body of learning or experience in the expert's field before admitting such testimony, and they must exclude testimony that uses the scrim of expertise to obscure a lay impression about a case. *Kumho Tire Co.*, 526 U.S. at 152, 154–55, 119 S.Ct. 1167; *Joiner*, 522 U.S. at 144–45, 118 S.Ct. 512; *Dau-*

*bert,* 509 U.S. at 594–95, 113 S.Ct. 2786; *see generally* Fed.R.Evid. 702 advisory committee's note (2000).

Hotchkiss misconstrues the central reasons I struck Fluharty's testimony. It makes two arguments regarding the admissibility of Fluharty's testimony. First, Hotchkiss argues Fluharty is an expert in the field and was well-qualified to testify. Second, the school argues that I invaded the province of the jury in finding that Fluharty lacked a sufficient factual basis for his opinion testimony. Those arguments are simply misplaced.

 As noted at trial, I struck Fluharty because he lacked a sufficient basis in facts or data for his proffered expert testimony and, lacking such a basis, he fabricated the supposed support for his opinion testimony and misrepresented his personal, lay opinions as reliable expert opinions. *See* Trial Tr. 1357:13–1361:13. Those defects rendered Fluharty's testimony inadmissible under Rule 702's requirements that specialized knowledge be based on sufficient data and that such opinions reliably derive from sound principles and methods. Determining the factual basis for an expert's opinion and the soundness of an expert's methodology falls within the "gatekeeping" function of district judges and is required to ensure the reliability and relevance of expert testimony. *Amorgianos,* 303 F.3d at 267. Any other characterization of my decision to strike Fluharty's testimony serves only to distract from the actual trial record.

Hotchkiss argued that, in addition to his individual experience, Fluharty's testimony was based upon and derived from data gathered from GEBG's 2008 survey of in-

ternational programs. Trial Tr. 1285:9–18, 1323:20–1324:4. After I qualified him as an expert, however, Fluharty revealed that the basis for his knowledge was not, and could not, be substantively linked to the results of the 2008 GEBG survey. As detailed in this subsection, Fluharty drew on isolated conversations with one to four other schools, represented his individual practice as an industry-wide standard without validation or evidence to substantiate his representations, gave *ipse dixit* testimony regarding matters for which he had no information or basis in fact, and frequently misled the jury by applying 2012 "standards" to 2007 conduct.

When Fluharty began to testify, he spoke at length on what he believed were the standard practices of independent schools offering travel-abroad programs in 2007. Trial Tr. 1290:2–1298:11. The Munns' counsel objected to Fluharty's qualification as an expert, but I overruled that objection. Trial Tr. 1286:20–1287:12. Fluharty continued to testify, indicating that he had spoken to numerous schools when establishing, and later conducting, the 2008 GEBG survey. Trial Tr. 1288:12–1289:15. The Munns' counsel again objected, challenging the basis for Fluharty's opinion; again, I overruled the objection. Trial Tr. 1289:16–18. Fluharty testified expansively, indicating that his opinion was based on the 2008 GEBG survey or on conversations with numerous other schools. Trial Tr. 1290:1–1298:11. As his testimony unfolded, however, it became clear that the basis for Fluharty's testimony was not a survey of school practices, but rather anecdotal conversations with only a handful of schools.[27] After prompt-

---

**27.** Q: Mr. Fluharty, prior to the time that you became involved in [GEBG] in 2008, did you have any involvement with your colleagues from other schools that ran international programs?

A: ... prior to 2007, my primary contacts would have been with [4 schools].
*See* Trial Tr. 1288:1–5.
Q: And prior to 2007, were the other schools with whom you were communi-

ing, he revealed that prior to 2008, he had only spoken informally to one other school regarding its trips to temperate areas of China.[28] Regardless what sample size would be sufficient to establish an industry-wide standard of care, a single observation from one other school is insufficient.

As direct examination proceeded, Fluharty's testimony deteriorated rapidly. It became clear that when he lacked adequate or comparable data on specific issues, he routinely substituted his personal opinion (*ipse dixit*) or his individual prac-

> cating sending students to other temperate zones, whether it was China or not?
> A: I didn't have a conversation with anybody else but [one school] on that topic.
>
> Trial Tr. 1304:10–14.
>
> Q: When you were putting together your travel program, did you talk with other schools or look at materials from other schools that were sending students to temperate zones for travel—
> A: Yes....
> Q: And what was the source of the information that you used when you were developing your program with respect to issues like insect protection in temperate zones?
> A: The schools I talked to provided me their resources.
> Q: And how many different schools did you talk to when you were doing that?
> A: Prior to 2007?
> Q: Yes.
> A: It would be the ones that I mentioned previously.
> Q: The four of them?
> A: Uh-huh (affirmative).
>
> Trial. Tr. 1305:1–18.
>
> Q: And in your work with GEBG, did you review the practices of schools with a global focus for the time period prior to 2008?
> A: Not more than the ones I already asked—talked about. [referring to one school with a China program, and three other schools with programs in Europe].
> Q: And so when you were looking with GEBG about trying to come up with standards, did the members discuss what they had been doing prior to 2008?
> A: No. The members were talking about what they were doing at that time.

tice for proper expert opinion about industry standards. When asked if a common practice existed regarding protection against insect-borne diseases on trips to temperate areas of China, Fluharty testified at length on "the standard" for those programs.[29] Trial Tr. 1295:20–1298:11, 1298:24–1299:4. He testified on the "common practice" of schools with respect to TBE-prevention, explicitly noting that his "conversations with other schools" and the GEBG 2008 survey provided the basis for his opinion.[30] Trial Tr. 1330:24–1331:21.

> Q: In 2008?
> A: Correct.
> Q: And so your work with GEBG does not form the basis of your understanding of what schools were doing in 2007, with respect to insect protection in foreign travel?
> A: No.
>
> Trial Tr. 1326:11–1327:1.

28. Q: In—before 2008, when you were sharing information with the [4 schools], did you discuss with your colleagues at those schools common practices with respect to protection against insect diseases in temperate areas?

> A: At the time, [one school] was the only school that had a China program....
>
> Trial Tr. 1298:19–1299:4.

29. Tropical zones are those areas of the Earth's surface between the Tropic of Cancer and the Tropic of Capricorn. *Random House Webster's Unabridged Dictionary* 2027, 2212 (2d ed.2005). Temperate zones refer to the earth's surface lying between the Tropic of Cancer and the Arctic Circle or between the Tropic of Capricorn and the Antarctic Circle. *Id.* at 1954, 2212.

30. Q: Was there a practice—were you aware of a common practice in 2007, with respect to the risk assessment of TBE in temperate zones?

> A: Yes.
> Q: And what is the basis of that understanding of the common practice of that type of risk assessment?
> A: It's based on my association with those other schools.

As he continued to testify, he revealed that the basis for his opinion was not conversations with other programs, but rather, his own school's practices related to trips undertaken in 2010—three years after Munn's participation in the Hotchkiss China trip.[31] In fact, Fluharty had no data regarding insect-prevention practices for travel-abroad trips to China in 2007 beyond his conversation with one other school, and the 2008 GEBG survey asked no questions related to the prevention of insect-borne diseases, let alone TBE.[32] Thus, Fluharty had no basis whatsoever to offer an opinion regarding standard practices of schools regarding protections against insect-borne diseases.

When it became clear to me that Fluharty was simply making up his testimony as needed and testifying about later-devel-

> Q: And your work with the assessment, the bench marking for the GEBG?
> A: Uh-huh (affirmative).
> Q: And based on that information, what was your understanding of the common practice with respect to the risk assessment of the risk of TBE in temperate zones?
> A: The common practice is, the risk is deemed extremely low; therefore, we did not have any prevention practices that we incorporated. Prior to 2007, we did a risk assessment for Asia, and there was no case of any American traveler ever getting tick-borne encephalitis; therefore, we had no reason to have a preventionary (sic) practice.
> The Court: So when you say "we," you mean your school?
> A: I'm saying my school, yes.
> Trial Tr. 1330:24–1331:21.

31. Q: And have you led trips to China?

> A: I have.
> Q: And where in China have you led trips?
> A: I was—I've been to Tibet, but I was—in this particular case I was in Beijing, and the Chinese, the Great Wall of China, just north of Beijing.
> Q: And what kind of insect protection measures did you take when you were in Beijing and at the Great Wall—
> A: None.
> The Court: Was this prior to 2007?
> Q: Was this prior to—
> A: This was in 2010.
> Trial Tr. 1299:8–20.

32. Although Fluharty testified that the 2008 GEBG survey data provided information on insect-protection practices, Trial Tr. 1299:1–4, when pressed, he admitted that the survey had never asked any questions related to precautions taken against insect-borne diseases:

> Q: In connection with the survey that you did for the GEBG, did you ask questions about precautions taken against insect-borne diseases prior to 2008?
> A: No.
> Trial Tr. 1340:5–1342:22. Upon further questioning, Fluharty admitted that the conversations he referenced regarding "the standards" took place in 2010 and did not refer to pre-2008 practices, as he had indicated in his earlier testimony. Trial Tr. 1299:17–20.

Further, when asked to describe the survey questions related to risk assessment and health information, Fluharty answered questions authoritatively, suggesting that his answers were based on survey data, before conceding that the survey had never asked questions related to the subject of his testimony:

> [The Court]: The question really is: Did you learn anything regarding what schools commonly would do prior to 2007, with respect to determining other sources of information?
> A: Yes.
> Q: What did you learn, and how did you learn it?
> A: We did a survey.
> Q: Okay. And what was the survey question?
> A: The survey question was to rank your top sources for health information so we could adequate get a primary, secondary, and figure out what were the primary sources.
> [The Court]: Okay.
> [Defense Counsel]: And did your survey include any questions about under what circumstances, prior to 2007, the schools would resort to sources other than the CDC and State Department?
> A: No, the survey did not ask that specific question.
> Trial Tr. 1339:3–23.

oped standards, I called for a short recess and instructed Hotchkiss's counsel to ensure that Fluharty limited his testimony to pre–2007 practices and that he only label a practice as a "standard" if he had a legitimate basis, grounded in fact, to believe that schools generally followed a specific practice. Trial Tr. 1300:15–1301:5. Hotchkiss's counsel responded by offering to ground Fluharty's opinions in "what he learned subsequent to 2007, in connection with the [GEBG]." Trial Tr. 1321:18–20. In the words of counsel, she "expect[ed] the witness [to] testify that, in 2008, when he formed the [GEBG], one of the things they did was do a survey of the practice of the members of the group. And based on that survey ... he learned what people had been doing prior to 2008 ..." Trial Tr. 1323:20–1324:1. I agreed to that approach. Trial Tr. 1322:6–1323:13, 1324:15–22.

In an attempt to salvage Fluharty's testimony, Hotchkiss's counsel then asked detailed questions about the content of the GEBG survey. During this colloquy, Fluharty testified, among other things, that the 2008 survey contained specific questions about how schools assessed medical risks, including the prevention of insect-borne diseases and whether they consulted with travel medicine experts. Trial Tr. 1335:4–1337:23 (sources of information on medical risk, with no questions asked about insect-borne diseases), 1345:11–22 (consultations with travel experts). Fluharty later revealed that his answers reflected data gathered in the 2012 survey, not the 2008 survey. Trial Tr. 1344:10–

1345:2, 1346:4–22. He could not identify if the 2008 survey asked for that data. *Id.*

Again worried that Fluharty was offering misleading testimony, I spoke with counsel. At that point, I was tempted to strike Fluharty's testimony based solely on his confused answers. It was clear to me that despite his qualifications, Fluharty's testimony in this case was not grounded in sufficient facts or data. *See* Trial Tr. 1357:12–1358:3, 1358:21–1359:13. I gave Hotchkiss's counsel a final opportunity, however, to cure defects in Fluharty's testimony by showing that he had accurately described the survey. Hotchkiss's counsel did not have a copy of the survey, but Fluharty offered to download a copy from his personal files.[33] He did so and provided the court a copy of the 2012 survey results.

Once I reviewed the 2012 survey, I had no choice but to strike his testimony. The survey results directly contradicted Fluharty's sworn statements about the basis for his testimony. *Compare* Ct. Exs. 1 & 2 *with* Trial Tr. 1299:1–4, 1333:6–23, 1335:4–11, 1339:3–23, 1342:19–1343:8, 1343:15–1344:25, 1345:5–1346:22, 1347:12–1348:13. Fluharty had testified extensively on the role of CDC advisories in risk assessment and cited the 2008 GEBG survey as his source, but the survey did not ask whether schools consulted the CDC's website or utilized that information when evaluating health risks. Trial Tr. 1359:1–6. He also testified at length on how schools mitigated the risk of students contracting diseases abroad, including whether those schools required pre-trip travel medicine consultations, but the survey con-

---

**33.** Fluharty was only able to download questions and results from the 2012 survey, but he assured the court that the 2012 survey asked substantially similar questions and yielded similar results to the 2008 survey. Trial Tr. 1351:4–1352:11. It is unknown if the surveys asked similar questions or if the data gathered

was relevant to Fluharty's proffered testimony because the court has never been provided a copy of the 2008 survey results. There was no information provided that would allow either party, or the court, to assess the accuracy of Fluharty's testimony regarding pre–2008 practices.

tained no questions on those issues.[34] Trial Tr. 1359:19–1360:13. What began as a concern about the soundness of Fluharty's opinion had progressed to a deep concern about the fundamental trustworthiness of it. Simply put, when in doubt, Fluharty repeatedly made up answers to counsel's questions, without any basis in fact or any methodology for doing so.

■ Rule 702 empowers me to admit expert testimony only so long as it is reliable. I can think of no stronger basis for excluding testimony than proof that the testimony lacks any basis in fact. When the complete hollowness of Fluharty's testimony became apparent, we were too far along to parse the accurate from the inaccurate and misleading and to strike only portions of Fluharty's testimony. *See* Trial Tr. 1359:19–1361:13. I chose the most reasonable solution that I could and struck the entirety of Fluharty's testimony, without chastising him or defense counsel in front of the jury. Trial Tr. 1359:19–1362:11. Hotchkiss focuses its objections on Fluharty's qualifications, and I do not dispute that he has extensive experience in his field. I struck Fluharty not because of a lack of qualifications but because his testimony in this case was not based on sufficient facts or data, as required by Rule 702, and because, when Fluharty was asked to limit his testimony to reliable bases, he did not testify truthfully. I struck Fluharty's testimony for those reasons, consistent with my obligation to ensure the fundamental reliability of expert testimony. Even in hindsight, I see no error in that decision.

### 4. *Lawrence Forman*

Hotchkiss next argues that a portion of expert Lawrence Forman's testimony was inadmissible. The school claims that Forman, a lifecare planner, relied on inadmissible hearsay because he credited another expert, physiatrist Dr. Andrew Yuan, when testifying that Munn would require a life coach throughout her life. Under Rule 703, an expert may rely on inadmissible information if "experts in the particular field [of the witness] would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Hotchkiss admitted at trial that a treating physician's opinion would fall within that exception, Trial Tr. 902:15–21, but argued that an .expert physician's opinion is qualitatively different because that expert's opinion is inherently biased. Trial Tr. 905:22–906:6. According to Hotchkiss, Forman amplified Yuan's bias because Yuan never testified at trial, so the school never had an opportunity to expose any flaws in Yuan's analysis. If the school is correct about Forman's opinion, then the damage award must be reduced by about $5.9 million.

■ Forman's opinion, however, was sound and properly admitted. If there was bias here, it was not Forman's. Forman opined about the appropriate care necessary to support Munn over her lifetime. He did not testify about the extent of Munn's physical disability. Forman certainly assumed that Yuan was correct

---

**34.** Hotchkiss argued at trial and argues now that written standards are not required to establish an industry custom or practice. That argument fails to understand the concerns with Fluharty's testimony. Although a standard of care, practice, policy or custom need not be set down in writing, when an expert offers his opinion to determine that standard, his opinion must be based in fact or data, must employ sound methods, and must apply those facts and methods to the instant litigation. Here, Fluharty could not demonstrate that data existed regarding the issues about which he was testifying as an expert, and as a result, he could not articulate a connection between his opinion and underlying facts, nor could he demonstrate that his methodology, if any, was sound.

about Munn's deficits and formulated a treatment plan accordingly, but that is no different than the kinds of permissible assumptions experts make all the time. For example, the Munns offered Dr. Gary Crakes as a statistical expert. Crakes took Forman's treatment plan and ran it through a statistical analysis that calculated the lump sum necessary to ensure Munn's care over her lifetime. For all Crakes knew, Forman was a charlatan, but that would not make Crakes's statistical analysis inadmissible. It only provided Hotchkiss with a strong cross-examination; its counsel was free to ask questions that skewered Crakes for assuming too much. Forman's reliance on Yuan is no different: Hotchkiss had the opportunity to show that Forman had no way of knowing if Yuan was a quack or a competent professional.

■ But even if Forman impermissibly relied on hearsay, such reliance did not prejudice Hotchkiss's case. Forman did not rely on Yuan's opinion to determine that Munn needed a life coach; Forman came to that conclusion after his conversations with a different expert, Dr. Robert Tepley, a neuropsychologist who did testify at trial. Forman believed that Munn "lacked judgment," an opinion he derived from "the parents, and ... the neuropsychological reports." Trial Tr. 1149:22, 1151:24–25. Hotchkiss later inquired why Munn's lack of judgment was so profound as to require a life coach, asking "[a]nd what is it that that community living coach would do for [Munn]?" Trial Tr. 1156:8–9. Forman responded by referring to problems identified by Tepley, explaining that a life coach would "help her with organization, follow-through, problems as they arise, planning, implementing, managing, communicating, and doing other things that arise as her life evolves," and repeating that "her parents have indicated, the neuropsychologist [h]as indicated [she requires this help]." Trial Tr. 1156:10–13, 23–25.

Yuan agreed that Munn could use an aid to help with daily activities, though his agreement only ratified Tepley's opinion. As Forman admitted, both Tepley and Yuan indicated that Munn would need help for three to five hours a day, five days a week. Trial Tr. 1157:4; Pls.' Trial Ex. 32, at 10. Yuan's opinion was never the sole basis, or even the principal basis, of Forman's opinion that Munn required a life coach. In his original report, Forman opined that Munn needed a physical assistant, someone "who does things for you." Trial Tr. 1157:11–17. In his amended report, however, he took out the cost of a physical assistant because "Dr. Yuan didn't think it was needed." Trial Tr. 1157:18–21, 1158:7–14. In contrast, Forman prescribed a life coach after he realized that Munn's difficulties were "mainly with cognitive issues." Trial Tr. 1158:12. Thus, if Yuan affected Forman's opinion at all, it was mostly by informing Forman that Munn was more physically able than Forman initially believed.

Given that Forman's opinion complied with Rule 703, and that even if it did not Hotchkiss suffered no prejudice, I see no error in my admission of Forman's testimony.

### C. Damages

■ Finally, Hotchkiss requests a substantial remittitur of the jury's non-economic damages award and a collateral source reduction. The size of an award for damages is "a matter peculiarly within the province of the trier of fact, in this case, the jury." *Mahon v. B.V. Unitron Mfg., Inc.*, 284 Conn. 645, 661, 935 A.2d 1004 (2007). This is particularly true for non-pecuniary awards, where compensation depends upon valuations of imprecise dam-

age components, like the price of loneliness or the cost of despair. *See Bhatia v. Debek,* 287 Conn. 397, 420, 948 A.2d 1009 (2008). Hotchkiss's request for remittitur of Munn's non-economic damages is denied, and its motion for collateral source reduction is denied as moot in light of the parties' stipulation on collateral sources (doc. 251). The joint stipulation is adopted, and the economic damages award will be reduced by $284,094.61 for a total resulting economic damages award of $9,965,905.39, and a total damages award (economic and non-economic) of $41,465,905.39.

### 1. *Non–Economic Compensatory Damages*

 A trial court may only reduce an award if it perceives an "extraordinary departure from reasonableness" in the jury's calculations. *Saleh v. Ribeiro Trucking,* 303 Conn. 276, 283, 32 A.3d 318 (2011).

> The ultimate test which must be applied to the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, prejudice, mistake or corruption.

*Id.* at 281, 32 A.3d 318 (alteration in original, internal citations and quotation marks omitted). A court must give "definite and satisfactory reasons for ... ordering [remittitur]. Merely stating that an award shocks the conscience or the sense of justice of the court or that the award does not fall within the necessarily uncertain limits of fair and reasonable compensation will not be sufficient." *Id.* at 283–84, 32 A.3d 318. In determining whether to order remittitur, "the trial court is required to review the evidence in the light most fa-

vorable to sustaining the verdict." *Id.* at 280, 32 A.3d 318.

 At trial, the plaintiffs argued that Munn suffers from a perfect storm of symptoms that, taken together, magnify individual deficits into a debilitating and humiliating disability. Munn cannot talk. Trial Tr. 800:10–11. She cannot communicate through sign, Trial Tr. 929:5–15, nor can she type quickly enough to allow a computer to generate audible words at a natural speed—it takes her a long time to produce a short phrase. Trial Tr. 894:16–24. Munn is not only mute; she cannot have a sustained or rewarding social exchange with another person. Munn cannot loosen her facial muscles enough to register her emotions accurately. Trial Tr. 1010:3–14. She cannot tighten her muscles when they slacken, which means she often drools so profusely that strangers stare at her in public places. Trial Tr. 793:8–794:10. Munn always looks like she is flashing a wide-eyed smile, and she sometimes wears wrist bands to mop her saliva. Her facial expressions alternately alienate or disgust the people she attempts to befriend. Munn lacks cognitive skills; in particular, she has limited executive function. Trial Tr. 848:22–850:7. But she also has retained much of her raw, pre-injury intelligence. Trial Tr. 868:10–869:2. Munn's cognitive injuries are greater than simply being unable to work through complex problems—she perceives the right solution but cannot implement it. As the Munns' counsel described, Munn "is like a world-class sprinter forced to live in a box for the next 66 years." Pls.' Mem. in Opp'n to Def.'s Mots. for JMOL, New Trial, and to Alter Judgment 74 (doc. 218).

The Munns' evidence supported the theory that Munn's injuries are uniquely cruel. As Christine Munn recounted, Munn has no social life because

[m]ost of [Cara's] life for the past five years, [has] really been devoted to therapy and getting herself back. And she really doesn't have much of a life outside of going to therapy and trying to improve herself. She doesn't have a social life. And she's [sic] spends all her time either just working on her penmanship or trying to work on her speech, or really, she has to spend a lot of extra time working on her homework.

Trial Tr. 931:3–10. Her only social contact occurs online. *See* Trial Tr. 933:2–934:5, 936:16–19, 940:20–23 (Christine Munn lamenting that Munn never attends college parties, dances or other social events). Every witness who knew or met Munn commented on her monkish existence. *See* Trial Tr. 879:8–25 (Tepley describing "the social side of things [as] a challenge"), 993:16–25 (Orson Munn noting that Munn has no friends), 1077:13–1078:7 (Dr. Jeff Blank recounting that over the course of four appointments with Munn in which they walked around her college campus, she never interacted with anyone else), 1113:1–4 (Forman explaining that "her social life is pretty nonexistent, except with her family"), 1123:8–21 (Forman noting "she really has no socialization" and that Munn's isolation is like living "in a cocoon"). No one expects this isolation to abate. Munn believes that she will never date, let alone have a family; in her words she imagines she will remain "an old spinster" and wonders how she would be able to teach her children, if she were able to have any, to speak. Trial Tr. 1014:20–1015:19. Indeed, experts testified that it would be difficult for Munn to perform the basic tasks necessary to manage her own life, let alone ensure the growth, health and safety of a child. Trial Tr. 876:12–879:7.

Munn's solitude stings her acutely. She has contemplated suicide, and experts expect that she will again crash into a deep depression once she leaves the relatively structured setting of a school environment. Trial Tr. 938:14–18 (suicidal ideation), 1124:21–22 (same), 880:11–881:10 (risk of depression), 1123:17–21 (Munn at risk for significant depression post-college). She feels shamed when people gawk at her in restaurants as she struggles to eat; as her father testified, Munn cannot control her mouth enough to chew food or swallow drinks in a normal manner, so that at twenty-one her eating looks childlike. Trial Tr. 992:2–23; *see also* Trial Tr. 846:19–24 (Tepley describing Munn's eating as not "a smooth process" because "the food doesn't quite stay and, you know, she has to kind of use her hand to try to make sure that it does"). Her heart broke when a boy that she dated prior to her trip to China dumped her and posted cutting remarks about her on Facebook. Trial Tr. 1123:9–12. She rages when people assume that she suffers from severe mental retardation, and she cannot correct that impression. Trial Tr. 798:5–12, 935:24–936:19. Perversely, Munn is arguably in a more emotionally-compromised position than some people with more profound cognitive impairments because they may have the odd blessing of not understanding the depth of others' rejection of them. Thus, according to witnesses, Munn lives in a peculiar hell: she knows what she has lost, cannot find cathartic expression for that loss and is treated as if she has lost far more. Because she has a normal life expectancy, she may suffer alone in this state for the next sixty-plus years.

The emphasis on Munn's emotional distress should not distract from the evidence of her past physical pain and her future physical limitations. Munn endured a grueling illness and recovery. At her lowest point, she was paralyzed and semi-comatose. Trial Tr. 912:1–919:25. Because she could not swallow on her own, she had to

be fed through a feeding tube that "was so painful ... like swallowing pool water three times a day." Trial Tr. 1012:3–5. She spent many weeks at a rehabilitation center where she had to relearn to eat, walk, write, button her clothes and a host of other basic tasks. Trial Tr. 920:1–923:25. Though she can now move through the world unassisted, she is still physically limited in ways large and small. Munn visibly struggles with extreme muscle tightness and stiffness that impede her ability to use her arms, hands and legs. And though the absence of Munn's speech is not a physical malady, it profoundly impedes her physical mobility. To use one example, Christine Munn testified that she has to manage Munn's trips off-campus via text message. Every time Munn needs to call a taxi cab, she texts her mother in New York, who calls a cab company in Hartford to pick up Munn. But often other students take Munn's cabs, and Munn has no ability to protest or indicate that the cab was called for her. So Munn texts her mother that "someone took my cab," Christine Munn calls the cab company again, and the cycle repeats. Trial Tr. 937:7–17. Like her isolation, Munn's physical limitations are unlikely to improve. Tepley testified that brain-injury victims make almost all of their progress in the first six to twelve months after their injuries, foreclosing the likelihood that Munn will make any meaningful improvement at this point. Trial Tr. 872:14–17.

Witnesses' accounts and my own courtroom observations of Munn's emotional and physical suffering depict a miserable life. Such a dire description may overstate her despair, and it might underestimate her ability to cope with her disabilities over time. We have thankfully left the age of sanatoriums behind, and many disabled people lead rich lives and make meaningful contributions to society. Moreover, Munn has the good fortune of retaining certain abilities: She has written for a blog about fashion. Trial Tr. 982:21–983:7. With assistance, she has even traveled abroad again. Trial Tr. 893:7–16. But the issue here is not whether Munn might cobble together fulfilling moments during her life, it is whether the jury reasonably could have found that she rarely will be able to do so, and, thus, fairly awarded Munn a large amount of money to compensate her for that loss. As detailed above, the Munns provided the jury with more than enough evidence to reach that pessimistic conclusion.[35]

**35.** Hotchkiss failed to rebut the Munns' account with its own credible picture of Munn's disabilities and life. It proffered one witness, life-care planner John Dahlberg, to testify about the extent of Munn's injuries. From Dahlberg's testimony, it was readily apparent that he had little to no sense of the extent of Munn's challenges: He never met with her. He never contacted her family. He did not speak to any of her treating physicians or to the experts who examined her. Trial Tr. 1394:1–1397:25. When Dahlberg described Munn, his account bore little similarity to the person that the jury had seen testify in person days before. Dahlberg testified that, after reviewing records and watching videos of Munn's deposition, he did not recall her having any issues with smiling—a surprising conclusion because, as the jury could observe and as she testified, Munn always appears to be smiling. Compare Trial Tr. 1400:1–6 with Trial Tr. 1010:4–6. Dahlberg testified that Munn keeps from drooling by "tilt[ing] her head back," a strategy that she did not use in the courtroom; as her counsel indicated and Munn confirmed, she uses two fingers to push her lips closed. Compare Trial Tr. 1401:8–13 with Trial Tr. 1012:11–13. He said "she is speedy keyboarder," a fact belied by the long pauses the jury witnessed as Munn slowly tapped out a phrase, often needing both hands to control a single finger. Compare Trial Tr. 1402:15–16 with Trial Tr. 894:16–24. Dahlberg testified he thought she could yell for help in an emergency, contrary to the feeble sounds the jury heard Munn emit and the testimony of other experts. Trial Tr. 794:25–795:1, 1124:18–21, 1411:11–16. He

Given that the jury had a sufficient evidentiary basis to award Munn a substantial sum, I am left to evaluate whether $31.5 million in non-economic damages is just too much money as a matter of law. There are no established criteria for this analysis.[36] But as Hotchkiss conceded at oral argument, there is no evidence in this case that the jury ignored the law, acted out of punitive animus towards the defendant or otherwise failed to fulfill their duties responsibly.[37] Mot. Hr'g Tr. 59:25–60:5, 60:14–18 (July 11, 2013); see also Mahon, 284 Conn. at 661–62, 935 A.2d 1004 (explaining that remittitur should be ordered "only when it is manifest that the jury [has] included items of damage which are contrary to law, not supported by proof, or contrary to the court's explicit and unchallenged instructions."). In the absence of jury malfeasance, the size of the verdict would have to be so outrageous that it casts doubt on what otherwise appears to be a fair process.

Other courts faced with this question have taken a common-law approach and have compared an award to verdicts in similar cases. See Pouliot v. Paul Arpin Van Lines, Inc., 235 F.R.D. 537, 550–51 (D.Conn.2006). The logic underlying this approach assumes that if another group of citizens priced a victim's suffering comparably, then a jury likely used an objectively reasonable method to arrive at its verdict. It is difficult to find a case exactly like Munn's, in which a young person has a normal life expectancy,[38] suffers from significant but not entirely debilitating physical ailments and severe social stigma, and retains much of her intelligence but has no ability to utilize it. There are birth-injury cases where victims received large awards for a similar amount of time spent in pain. See, e.g., D'Attilo v. Viscarello, No. X10 UWY–CV–05–4010135–S (Conn.Super.Complex Lit. Docket 2001) (awarding $50 million in non-economic damages for forty-three years of expected pain and suffering); Cowles v. Hartford Hosp., No. X06 CV–00–01–0168303–5, 2005 WL 4841411 (Conn.Super. Nov. 23, 2005) (verdict of $16.5 million in pain and suffering damages where life expectancy was unknown). Those plaintiffs may have needed much more day-to-day assistance than Munn, but they faced the same level of social isolation as Munn without the burden of understanding what they had lost. There are also cases with similar awards in which adults suffered a life-altering injury that left their cognition intact. See, e.g., Saladino v. Amer. Airlines, 500 Fed.Appx. 69, 75 (2d Cir.2012) (upholding denial of remittitur in case in which quadriplegic man, who could not feel pain because of

testified that he did not "see any limitations in her cognitive ability." Trial Tr. 1409:20–21. The jury, then, was left with two depictions of Munn's life: One a compelling, ably-presented picture of a damaged, young woman living in misery, and the other an account that sounded nothing like the person they had actually met. It is not surprising, then, that the jury seemed to have fully credited the Munns' witnesses.

**36.** This contrasts with emergent jurisprudence governing punitive damage awards. See Philip Morris USA v. Williams, 549 U.S. 346, 351, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007) (outlining criteria for evaluating puni-

tive damage awards and noting that "single-digit multipliers are more likely to comport with due process").

**37.** Indeed, this jury struck me as attentive, serious, and dedicated. They took two days to deliberate after seven days of evidence. They were also diligent, arriving at court early, even on a snowy morning. Trial Tr. 427:2–8; Mot. Hr'g Tr. 59:14–15 (July 11, 2013).

**38.** Munn was injured at fifteen, and experts predict she will live to roughly eighty years of age.

compromised nervous system, received $15 million for thirty-five years of pain and suffering); *Pouliot*, 235 F.R.D. at 550–51 (denying remittitur where paraplegic man was awarded $20 million in non-economic damages for expected lifespan of thirty-seven additional years). Paralysis victims, however, endure greater physical limitations than Munn, though unlike Munn, they can usually speak and communicate well enough to maintain old relationships and create new ones.

Taken together, those cases present a similar constellation of injuries as Munn's. Her verdict falls in the middle of the range of awards in comparable cases. In those cases, victims received between fifteen and fifty million dollars for post-injury life expectancies of between thirty-five and forty-three years. If Munn's award were converted into an annual rate—an admittedly difficult task given variable rates of interest over time—she would receive roughly $477,272 per year.[39] This allocation rests on the low end of the rates for comparable cases, which compensated victims at an annual rate of between $428,571 and $1,162,791 per year.[40]

Make no mistake—Munn was awarded a significant amount of money that will ensure that she will want for nothing material. Had the decision been mine, I likely would have awarded somewhat less. But "[t]he fact that the jury returns a verdict in excess of what the trial judge would have awarded does not alone establish that the verdict was excessive." *Campbell v. Gould*, 194 Conn. 35, 41, 478 A.2d 596 (1984). Further, given the subjective nature of a non-economic damages inquiry, we should expect disparities between what a judge and what a jury might award. What is the price of relying on your parents to find you a prom date? Trial Tr. 934:19–22. How much money replaces the loss of the joy you felt when playing the piano? Trial Tr. 927:2. Can you calculate the cost of missing your teenage years, of never maturing socially and emotionally beyond the age of fifteen? Trial Tr. 993:19–25. When evaluating the totality of the harms that Munn suffers, I cannot say that the jury's award falls outside the range of reasonable verdicts in this case.

### 2. *Collateral Source Reduction*

Connecticut allows the court to reduce a plaintiff's past economic damages award in personal injury cases "by an amount equal to the total of amounts" paid by collateral

---

39. Hotchkiss argues that any annualized rate should be discounted to reflect the time value of money. The school is correct that the Second Circuit allows a defendant to request that a jury consider a standard discount rate when calculating an award. *Oliveri v. Delta S.S. Lines, Inc.*, 849 F.2d 742 (2d Cir.1988). Hotchkiss never requested such an instruction during the course of litigation and has waived that argument. Further, the task at hand requires less exact math. In order to judge whether an award is reasonable, the court need only compare the award to other cases. Given that a general proportionality among verdicts is all that is required, I see no need to calculate a discount rate for Munn's award or to adjust awards from other cases for inflation.

40. Other juries may have been less generous than the jury in this case. In *Jacobs v. Yale University*, No. 277513, 2000 WL 1530030, at *1 (Conn.Super. Sept. 21, 2000), for example, a jury awarded a young man only $10 million in non-economic damages even though he was blinded, could not speak, lacked motor control in all four limbs, and had cognitive impairments from his injury. Hotchkiss argues that *Jacobs* demonstrates the extravagance of Munn's award; she received three times as much for a similar harm. But it is equally likely that Munn's award demonstrates that the *Jacobs* jury was miserly. One data point provides an insufficient basis from which to determine that a jury grossly miscalculated an award.

sources, less payments made by the plaintiffs to those collateral sources—in this case, health insurance premiums. Conn. Gen.Stat. § 52–225a. The primary purpose for this statute was "to prevent plaintiffs from obtaining double recoveries, i.e., collecting economic damages from a defendant and also receiving collateral source payments." *Jones v. Kramer,* 267 Conn. 336, 342, 838 A.2d 170 (2004); *Corcoran v. Taylor,* 65 Conn.App. 340, 344–45, 782 A.2d 728, *cert. denied,* 258 Conn. 925, 783 A.2d 1027 (2001).

In response to Hotchkiss's motion to alter judgment (doc. 209), the parties filed a joint stipulation noting that the Munns' past economic damages should be offset by the amount covered by collateral sources (health insurance) less the Munns' insurance premiums, a total offset amount of $284,094.61 (doc. 251). The jury awarded the Munns $450,000 in past economic damages. After accounting for collateral sources, the amount awarded for past economic damages becomes $165,905.39, and Munn's overall damages (economic and non-economic) become $41,465,905.39.

I approve the parties' collateral source stipulation and accordingly deny as moot Hotchkiss's motion to alter judgment with respect to this issue.

## IV. Conclusion

For the reasons set forth, Hotchkiss's motion for judgment as a matter of law (doc. 206), motion for new trial (doc. 207), and motion to alter judgment (doc. 209) are denied. The parties' stipulation on collateral source reduction (doc. 251) is adopted, and an amended judgment will enter in favor of plaintiffs in the total amount of $41,465,905.39.

It is so ordered.